**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
CONNECTICUT FUND FOR THE                  :   Case No. 15-6323
ENVIRONMENT, INC., d/b/a SAVE THE SOUND   :
                                          :   **COMPLAINT FOR**
                           Plaintiff,     :   **DECLARATORY AND**
                                          :   **INJUNCTIVE RELIEF AND**
             v.                           :   **CIVIL PENALTIES**
                                          :
WESTCHESTER COUNTY,                       :   (Federal Water Pollution Control
NEW YORK,                                 :   Act, 33 U.S.C. §§ 1251 to 1387)
                                          :
                           Defendant.     :   JURY DEMAND
                                          :
-------------------------------------------------------------- X

     Plaintiff Connecticut Fund for the Environment, Inc. d/b/a Save the Sound, brings this

"citizen suit" under section 505(a)(1) of the Clean Water Act ("the Act" or "CWA"), 33 U.S.C. §

1365(a)(1), against Westchester County to address and abate its continuing violations of the Act.

## I.       INTRODUCTION

     1.    Long Island Sound is a unique estuary that has two connections to the sea and

receives the flow of several major rivers that drain fresh water from New England and as far as

the U.S. border with Quebec.  The Sound provides feeding, breeding, nesting and nursery areas

for a diversity of plant and animal life, including 1,200 species of invertebrates, 170 species of

fish, and dozens of species of migratory birds.  It contributes $8.5 billion annually (adjusted for

inflation in 2009 dollars) to the regional economy from boating, commercial and sport fishing,

swimming, and sightseeing.  Nearly nine million people live in the Long Island Sound

watershed, which includes the north shore of Long Island and the entire coastline of Connecticut.

In 1987, the Sound was designated as an Estuary of National Significance.

     2.    But Long Island Sound is no longer a jewel.  As a result of pollution, Long Island

Sound, and especially its western portion which borders Westchester County, is suffering ever

increasing degradation in water quality, leading to low shellfish harvests and the closure of shellfish beds, depletion of fishing stocks and fish consumption advisories, periodic beach closures, restrictions on  recreational activities, low dissolved oxygen (hypoxia), pathogen contamination, toxic contamination, and floatable debris, adversely impacting businesses, public health, recreation, and aesthetics.

3.      For example, hypoxia refers to low dissolved oxygen concentrations in the water. Marine organisms need oxygen to live, and low concentrations can have serious adverse consequences for a marine ecosystem.  Certain pollutants are known to contribute to hypoxia in Long Island Sound.  The EPA has studied this problem for years and found that hypoxia is a chronic condition in the western portion of the Sound, occurring in 90% to 100% of the years of the study period from 1994 to 2014.



Source:  http:longislandsoundstudy.net/indicator/frequency-of-hypoxia/.

4.     A substantial source of pollution in the Sound comes from cracked sanitary sewer pipes which are supposed to transport sanitary wastewater from homes, businesses, public toilet facilities, and other locations to wastewater treatment plants for removal of pollutants in order to make the water safe for discharge into the environment.  However, during heavy rains, as a result of their deteriorated condition, these sewer pipes overfill with stormwater, which should flow through separate storm drains, causing sanitary sewage overflows or sewage discharges into the Sound.

5.     The Clean Water Act was enacted in 1972 and it, along with its amendments over the years, mandates that our nation's waterbodies be made clean.  For Long Island Sound, this means that it must meet water quality standards that make it safe for fish, shellfish, humans and all other species that live on it and in it.  From the beginning, it was understood that polluted waters could not be made clean overnight, but that through a multi-year process of limiting pollutants, eventually, the waters would become and remain clean.  The Clean Water Act, and its companion Clean Air Act, along with other federal environmental laws, mandate that we have a clean environment.  Our country made a choice decades ago that unabated pollution entering our air and water was unacceptable.

6.     Sadly, 43 years after the enactment of the Clean Water Act, Long Island Sound (including its harbors and tributaries) is a polluted water body.  Most of the Sound's coastal reaches of Westchester County are classified by the Environmental Protection Agency (EPA) as "impaired" for bacterial or pathogenic pollution, meaning it is chronically considered unsafe for swimming and fishing due to excess pollution.

7.     It has been well known that, to meet the mandate of the Clean Water Act, the entire sanitary sewage system, including not only the sewage treatment plants, but also the pipes that transport sanitary effluent to those plants, must be built and maintained in good working order. In a well-designed and maintained system only the wastewater from homes and businesses would be transported through these sanitary sewer pipes for effective treatment at the sewage treatment plants, which then would discharge cleansed water into a receiving water, such as Long Island Sound.  However, when this system is ill-designed or not maintained, pipes become porous as a result of cracks or breaks, allowing rainwater to enter the system, especially during heavy rain, leading to flow beyond the capability of the treatment plants to effectively treat. Untreated or only partially treated wastewater then escapes the system and enters the Sound. Sanitary sewer pipes in Westchester County were mostly installed when the streets were initially built, in many cases more than 100 years ago.  Sanitary pipes that connect from houses and commercial buildings into these sewer systems were installed when those buildings were constructed.  Over time, all of these pipes deteriorate, leading to cracks and breaks in the system.

8.     This case is not about new and advanced technologies.  It is about insisting on basic inspection, maintenance, and upgrading of the sanitary sewer systems to meet mandated standards.  New York State, Westchester County, and the municipalities that are connected to the county's sewer system recognized almost 20 years ago that sanitary sewer pipes were degrading and needed to be inspected, repaired, and maintained.  However, the steps that have been taken since then, have been (and were known to be) insufficient to materially affect the problem, and it is getting worse.  This case, which seeks to force Westchester County to take steps necessary to comply with the mandates of the Clean Water Act, specifically focuses on three types of violations.

4

A.   **Defendant illegally discharged partially treated sewage in the New Rochelle Sewer District.**

9.      Defendant has violated section 301(a) and 402 of the Act, 33 U.S.C. § § 1311(a), and 1342, by illegally discharging pollution—including but not limited to fecal coliform, settleable solids, suspended solids, biological oxygen demand, and nitrogen—into Long Island Sound from its Flint Ave. & Cherry Ave. - Sanitary Sewage Overflow Control Facility located in the Village of Larchmont, which is part of the New Rochelle Sewer District. This discharge, which was not authorized by, and violated the specific terms of, its State Pollutant Discharge Elimination System (SPDES) Permit[1], was the most recent of a series of discharges from this and another similar facility over the last seven years. Given the repeated occurrences of these discharges, especially in heavy rainfall conditions, and the County's complete failure to either close these facilities or rebuild them to provide the level of treatment mandated by the permit, future violations are all but inevitable.

B.   **Defendant's failure to comply with SPDES permit conditions that require Defendant to enforce the County Sewer Act to limit excessive flows from municipalities.**

10.     Defendant is violating the Act by failing to comply with a requirement of the State Pollutant Discharge Elimination System permits for the New Rochelle, Mamaroneck, Blind Brook, and Port Chester Sewer Districts, all of which provide that Westchester County, as the permittee, "is authorized to discharge … in accordance with: effluent limitations, monitoring and reporting requirements, other provisions and conditions set for in this permit; and 6 NYCRR Part 750-1.2(a) and 750-2."

11.     Each Sewer District is a publicly-owned treatment works (POTW), as defined by section 212 of the Act, 33 U.S.C. § 1292, and 6 NYCRR § 750-2.9, which was incorporated into

---

[1] A glossary of the pertinent acronyms and abbreviations is attached to this complaint as Appendix A.

the permits, and which requires that the County, as permittee remove excess inflow and infiltration that threaten proper functioning of the sewer system and "shall enact, maintain and enforce" an effective sewer use law.

12.      Defendant has failed and continues to fail to enforce the County Sewer Act (Westchester County Administrative Code, Chapter 824), which is a violation of each of the State discharge permits for the Sewer Districts. Specifically, Defendant has failed and continues to fail to enforce the requirement, under the County Sewer Act § 824.72, that municipalities may not introduce excessive inflow and infiltration into the county trunk sewer system.  Excessive inflow and infiltration (sometimes referred to as I/I or I&I) means the "quantity of flow entering the county sewer system which is greater than 150 gallons per capita per day [gpcd] for the population served by the tributary sewer systems located within a municipality's borders."

13.      In a 2009-2011 flow monitoring conducted by the County, which was approved by the New York State Department of Environmental Conservation (NYSDEC), Defendant concluded that all municipalities in the Sewer Districts have extraneous flows due to inflow and infiltration that exceeded the 150 gpcd threshold.  Further, the County has conceded that "I/I [inflow and infiltration] in the Westchester County Sewer Districts is a significant problem, contributing up to 50% of the flow to the WWTPs [wastewater treatment plants]. It is to be expected that the aging sewer systems will continue to deteriorate and I/I will continue to increase." Upon information and belief, all municipalities in the Sewer Districts continue to have extraneous flows due to inflow and infiltration exceeding 150 gpcd, as little or nothing has been done to effectively address this issue. And Defendant has utterly failed to take the steps necessary to compel compliance with the limitations as required by its SPDES permits.

C.   **Failure to implement state-mandated flow reduction requirements
with municipalities in the Sewer Districts.**

14.     Defendant is violating the terms of an Order on Consent in Case No. CO 3-
20080730-65, executed between the Defendant and the New York State Department of
Environmental Conservation in December 2008 (herein 2008 Consent Order), which required the
County to develop and implement a Flow Reduction Strategy Plan in the Sewer Districts.  The
County submitted such a schedule in the Flow Monitoring Program Report which was accepted
by the State. The 2008 Consent Order provided that if the State approved the submission, the
schedule would be incorporated into the Consent Order, and the County was required to
implement it. Thus, once the schedule was accepted by New York State, it became part of the
2008 Consent Order and is enforceable through a citizen suit under section 505 of the Act, 33
U.S.C. § 1365.

15.     The schedule incorporated into to 2008 Consent Order contained several
milestones for the reduction of inflow and infiltration from municipalities into the County's
sanitary sewer system.  However, the County has failed to timely complete the steps required,
thus rendering compliance with the schedule impossible.

16.     Plaintiffs seek all appropriate relief under the Act, including injunctive relief,
declaratory relief, civil penalties payable to the United States Treasury, and costs including
reasonable attorneys' fees.

## II.     JURISDICTION AND VENUE

17.     This court has subject matter jurisdiction over the claims set forth in this
complaint pursuant to section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), and 28
U.S.C. § 1331 (an action arising under the laws of the United States).

18.     On June 11, 2015, Plaintiffs gave notice of the violations and Plaintiff's intent to file suit to the NYSDEC, the Administrator of the EPA, the Regional Administrator of the EPA, Region 2, and to the Defendant—both to the County Executive and to the County Commissioner of Environmental Facilities—, as required by section 505(b)(1) of the Clean Water Act, 33 U.S.C. § 1365(b)(1).

19.     More than 60 days have passed since notice was served pursuant to section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

20.     As of the date of the filing of this complaint, neither EPA nor NYSDEC has commenced or diligently prosecuted a court action to redress violations under section 505(b)(1)(B) of the Act, 33 U.S.C. § 1365(b)(1)(B), nor an administrative penalty action that would preempt this action under section 309(g)(6)(A) of the Act, 33 U.S.C. § 1319(g)(6)(A).

21.     Venue is appropriate in the Southern District of New York pursuant to section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the alleged violations are located within this judicial district.

## III.   PARTIES

22.     Plaintiff Connecticut Fund for the Environment, Inc.  (CFE) is a 501(c)(3) not-for-profit corporation founded in 1978 and incorporated under the laws of the State of Connecticut, with principal place of business at 142 Temple Street, Suite 305, New Haven, CT 06510, and a New York office located at 545 Tompkins Avenue, 3rd Floor, Mamaroneck, NY 10543.

23.     Save the Sound was formed in 1972 as the Long Island Sound Taskforce to preserve and protect the Sound.  In 2004, Save the Sound merged with CFE, and is now a program within CFE.  CFE has registered that it is doing business in New York State as Save the

Sound.  Save the Sound's office is located at 545 Tompkins Avenue, 3rd Floor, Mamaroneck, NY 10543.

24.     Hereinafter, the plaintiff is referred to in this complaint as "Save the Sound."

25.     Save the Sound's primary purpose is to conserve and enhance the biological integrity of Connecticut's and New York's air, land, and water resources, including Long Island Sound. Save the Sound uses legal and scientific expertise, advocacy, and education in furtherance of its purpose to achieve results that benefit the environment for current and future generations.

26.     Save the Sound represents approximately 3,500 member households, many of whom use and enjoy Long Island Sound and its tributary rivers and streams.  Many of Save the Sound's members live on or near Long Island Sound, and enjoy, or recreate in these waters, including but not limited to fishing and boating, swimming, and other recreational activity. Save the Sound's members share a common concern about the quality of Long Island Sound and surroundings. The quality of Long Island Sound and surrounding areas directly affects the health, recreational, aesthetic, commercial, and environmental interests of Save the Sound's members.

27.     Save the Sound is a "citizen" for purposes of section 505 of the Act, 33 U.S.C. § 1365, and files this "citizen suit" on behalf of itself and its members.

28.     The acts and omissions alleged herein cause or contribute to pollution levels in waters used and enjoyed by Save the Sound's members, which are injurious to human health, wildlife, the aesthetic quality of those waters, commercial activities in or around Long Island Sound, and other uses pursued and enjoyed by Save the Sound members. The acts and omissions alleged herein threaten the health and welfare of Save the Sound members, impair and threaten their use and enjoyment of the above mentioned waters, deny them the level of water quality to

which they are entitled under the CWA, and deprive them of procedural rights and protections provided under the CWA. Save the Sound and its members have an interest that is adversely affected by the Defendant's illegal discharges and violations.

29.     The relief sought herein will redress the harms to Save the Sound and its members caused by Defendant's conduct. The continuing nature of the acts and omissions alleged herein will lead to irreparable harm to Save the Sound and its members, for which harm they have no plain, speedy or adequate remedy at law.

30.     Defendant Westchester County, New York is the entity holding the State-issued permits for the Sewer Districts, and is subject to a Clean Water Act citizen suit.

## IV.     STATUTORY BACKGROUND
## FEDERAL CLEAN WATER ACT

31.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA Section 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

32.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the Act. Discharges not authorized by, or in violation of, the terms of a permit issued by the EPA or a designated State agency are prohibited pursuant to section 301 of the Clean Water Act, 33 U.S.C. § 1311.

33.     Under section 402(a), (b) of the Clean Water Act, 33 U.S.C. § 1342(a), (b), the Administrator of the EPA has authorized the New York State Department of Environmental Conservation to implement a permitting program in New York, which is known as the State Pollution Discharge Elimination System  program.

10

34.     Section 308 of the Clean Water Act, 33 U.S.C. § 1318, requires permittees to maintain records, install, use and maintain monitoring equipment, sample effluent, and report regularly to the permit-issuing agency regarding the facility's discharge of pollutants. The reports are called Discharge Monitoring Reports (DMRs).

35.     The citizen suit provision of the Clean Water Act, section 505(a)(1), 33 U.S.C. § 1365(a)(1), authorizes any citizen to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation" or "an order issued by the Administrator or a State with respect to such a standard or limitation."

36.     Such enforcement action under the Clean Water Act includes an action seeking remedies for an unpermitted discharge in violation of section 301 of the Clean Water Act, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to sections 402 and 505(f) of the Clean Water Act, 33 U.S.C. § § 1342, 1365(f), and "an order issued by the Administrator or a State with respect to such a standard or limitation," CWA section 505(a)(1), 33 U.S.C. § 1365(a)(1).  As set forth in this complaint, Defendant is in violation of its permit conditions and of a duly issued order requiring compliance with standards and limitations.

37.     Declaratory relief in this case is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

38.     Injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a).

39.     Violators of the Act are also subject to an assessment of civil penalties of up $37,500 per day per violation for violations occurring after January 12, 2009. 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4.

## NEW YORK STATE LAWS AND REGULATIONS

40.     New York State Department of Environmental Conservation is charged with protecting the waters of the State pursuant to the Environmental Conservation Law, Article 17, and the State's SPDES permit program.

41.     The NYSDEC has issued regulations, under 6 NYCRR Part 750, that provide for "Obtaining A SPDES Permit" and "Operating In Accordance With A SPDES Permit." See 6 NYCRR Subparts 750-01 and 750-02.

42.     "Infiltration" is defined to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from the ground through such means as defective pipes, pipe joints, connections, or manholes. Infiltration does not include and is distinguished from inflow." 6 NYCRR § 750-1.2(45).

43.     "Inflow" is defined to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from sources such as roof leaders, cellar drains, yard drains, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers, process and sanitary sewers, catch basins, cooling towers, stormwaters, surface runoff, street washwaters, or drainage. Inflow does not include, and is distinguished from infiltration." 6 NYCRR § 750-1.2(46).

44.     A publicly owned treatment works (or POTW) has an obligation, *inter alia*, to "enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the POTW service area. Such enactment and enforcement shall include intermunicipal agreements and/or other enforceable legal instruments that allow the permittee to control discharges, either directly or through jurisdictions contributing flows to the

POTW, flow and loads to the POTW as well as discharges to the POTW." 6 NYCRR § 750-2.9 (4).

## WESTCHESTER COUNTY'S REGULATORY FRAMEWORK

45.     Westchester County's sewer use law is the County's Environmental Facilities Sewer Act (County Sewer Act). See Westchester County Administrative Code, Chapter 824.

46.     County Sewer Act § 824.72, includes a specific "[p]rohibition of introduction by municipalities of excessive inflow and infiltration into the county trunk sewer system," and sets forth several standards, monitoring obligations, and penalties.  Among other things it provides: "Excessive infiltration and inflow means the quantity of flow entering the county sewer system which is greater than 150 gallons per capita per day for the population served by the tributary sewer systems located within a municipality's borders." See Westchester County Administrative Code, Section 824.72 (2).

47.     The County Sewer Act § 824.72 also requires that "Municipalities shall have a continuing obligation to maintain and repair the tributary sewer systems within their borders such that they comply with the standards set forth in this section and shall annually file copies of all plans for such maintenance and repair program with the Commissioner of Environmental Facilities by September first of each year." See Westchester County Administrative Code, Section 824.72 (7).

## V.     STATEMENT OF FACTS

48.     The waters in Long Island Sound in and near Westchester County, including New Rochelle Harbor, are generally designated Class SA saline surface waters: "The best usages of Class SA waters are shellfishing for market purposes, primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and

survival." 6 NYCRR §701.10.  However, because of pollution, including as a result of the violations alleged, these waters are consistently not suited for such uses, due to the presence of pollutants including oxygen demand (hypoxia), excess nitrogen, and floatable debris.  These waters have been listed as "impaired" on New York State's 2014 Impaired Waters List.

49.     The waters in Westchester County's Larchmont, Mamaroneck and Port Chester harbors are Class SB saline surface waters: "The best usages of Class SB waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 NYCRR § 701.11. However, because of pollution, including as a result of the violations alleged, these waters are consistently not suited for such uses, due to the presence of pollutants including pathogens and floatable debris.  These waters have been listed as "impaired" on New York State's 2014 Impaired Waters List.

50.      Defendant's Blind Brook Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound, pursuant to SPDES Permit No. NY0026719.  The permit authorizes and regulates discharges from the treatment plant itself, located at 141 Oakland Beach Avenue, Rye, NY and, in exceptional circumstances, from certain emergency bypasses. The Blind Brook treatment plant collects and treats wastewater from four municipalities: the City of Rye, the Town/Village of Harrison, the Village of Mamaroneck, and the Village of Rye Brook.

51.     Defendant's Port Chester Sanitary Sewer District Wastewater Treatment Plant discharges into Long Island Sound, pursuant to SPDES Permit No. NY0026786.  The permit authorizes and regulates discharges from the treatment plant, which is located at Fox Island Road, Port Chester, NY.  The Port Chester treatment plant collects and treats wastewater from two municipalities: the City of Rye and the Village of Port Chester.

14

52.     Defendant's Mamaroneck Sanitary Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound, pursuant to SPDES Permit No. NY0026701.  The permit authorizes and regulates discharges from the treatment plant itself, located at West Boston Post Road, Mamaroneck, NY and, in exceptional circumstances, from certain emergency bypasses. The Mamaroneck treatment plant collects and treats wastewater from seven municipalities: City of New Rochelle, City of Rye, City of White Plains, Town/Village of Harrison, the Town of Mamaroneck, Village of Mamaroneck, and the Village of Scarsdale.

53.     Defendant's New Rochelle Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound, pursuant to SPDES Permit No. NY0026697.  The permit authorizes and regulates discharges from the treatment plant itself, located at 1 LeFevres Lane, New Rochelle, NY, from two sanitary sewage overflow (SSO) control facilities, and, in exceptional circumstances, from certain emergency bypasses. The New Rochelle treatment plant collects and treats wastewater from four municipalities: the City of New Rochelle, the Town of Mamaroneck, the Village of Larchmont, and the Village of Pelham Manor.

54.     The two sanitary sewage overflow control facilities (also termed Overflow Retention Facility or ORF) in the New Rochelle Sewer District are:  the Flint Ave. & Cherry Ave. - SSO Control Facility (Outfall No. 003), located in the Village of Larchmont, New York; and the Whitewood Ave. - SSO Control Facility (Outfall No. 005) located in New Rochelle.

55.     The SPDES Permit for the New Rochelle Sewer District required that Westchester County either eliminate discharges from the overflow retention facilities by August 1, 2014, or ensure that any future discharges comply with the effluent limitations under the Act's

"secondary treatment standards" under 40 CFR § 133.100 et seq., which is the standard that the New Rochelle treatment plant itself was designed to meet.  Upon information and belief, the sanitary sewage overflow control facilities in the New Rochelle Sewer District do not provide secondary treatment to wastewater before discharging to Long Island Sound, and the County has done nothing to eliminate all discharges or to achieve the required levels of water quality for such discharges.

56.     According to Defendant's Discharge Monitoring Reports, from 2008 to the present, the Flint Ave. & Cherry Ave. - SSO Control Facility (Outfall No. 003) has discharged 15 times into Long Island Sound, as shown in Table 1 below. After August 1, 2014, when the County was required to eliminate all discharges from this sanitary sewage overflow control facility or comply with stated pollutant limitations, on December 9 and 10, 2014, Defendant discharged nearly one million gallons of partially-treated sewage that did not meet secondary treatment standards from Outfall 003 into Long Island Sound. Moreover, the frequency and regularity of overflow discharges from this facility in the period prior to August 2014, especially during periods of heavy rainfall, illustrate that future and continuing discharges not authorized by, and in violation of, the SPDES permit are not only reasonably likely, but practically inevitable.

**Table 1 - Flint Ave & Cherry Ave - SSO Control Facility (Outfall No. 3) - Discharges 2008-2015 - NYSDEC SPDES Permit No. NY-0026697[2]**

| Date | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD5 (mg/l) | Chlorine, Total Residual (mg/l) |
|---|---|---|---|---|---|---|---|
| 02/29/2008 | 0.46 | 24000 | 22 | 0.1 | 14 | 47 | 0.8 |
| 09/30/2008 | 0.25 | 24000 | 47.8 | 0.1 | 15.7 | 52.6 | 1.7 |
| 12/31/2008 | 1.12 | 24000 | 17.9 | 0.1 | 8.9 | 38.1 | 1.1 |
| 06/30/2009 | 1.40 | 41 | 17.2 | 0.1 | 10.2 | 43.5 | 1.2 |
| 02/28/2010 | 0.56 | 40 | 9.9 | 0.1 | 5.5 | 25.6 | 1.4 |
| 03/31/2010 | 1.82 | 240000 | 24 | 0.1 | 11 | 39 | 1.8 |
| 03/31/2011 | 0.56 | 240000 | 16.8 | 0.1 | 6.9 | 22.7 | 1 |
| 05/31/2011 | 0.67 | 240000 | 34 | 0.1 | 874.3 | 36.4 | 1 |
| 08/31/2011 | 1.02 | 240000 | 44 | 0.1 | 14.2 | 29.8 | 1.3 |
| 09/30/2011 | 4.56 | 240000 | 15.3 | 0.1 | 8.2 | 2 | 1 |
| 09/30/2012 | 0.19 | 240000 | 34 | 0.1 | 10.3 | 48.3 | 0.9 |
| 06/30/2013 | 0.47 | 240000 | 32 | 0.1 | 10.8 | 58.5 | 1.9 |

[2] Sources: Westchester County, New York, Department of Environmental Facilities, New Rochelle Sanitary Sewer District, Overflow Retention Facility, Discharge Monitoring Report, June 2013; Westchester County, New York, Department of Environmental Facilities, New Rochelle Sanitary Sewer District, Overflow Retention Facility, Discharge Monitoring Report, 2014 Annual Summary; NYSDEC, SPDES Permit No. NY-0026697, DMRs 2008-2015.

| Date | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD5 (mg/l) | Chlorine, Total Residual (mg/l) |
|------|-----------|----------------------|--------------------------|---------------------------|-----------------------|-------------|---------------------------------|
| 03/31/2014 | 0.64 | 136059 | 20.3 | 0.1 | 5 | 18 | 1.4 |
| 04/30/2014 | 1.58 | 44398 | 19.7 | 0.1 | 9.1 | 35.2 | 1.3 |
| **12/31/2014** | **0.92** | **107331** | **375** | **0.1** | **7.6** | **81.9** | **1.5** |

57.     According to Defendant's Discharge Monitoring Reports, from 2008 to the present, the Whitewood Ave. - SSO Control Facility (Outfall No. 005) has discharged 9 times into Long Island Sound as shown in Table 2 below.  While Defendant has not reported discharges from Outfall 005 after August 1, 2014, the frequency and regularity of discharges in the period prior to that date illustrates that future and continuing discharges not authorized by, and in violation of, the SPDES permit are not only reasonably likely, but practically inevitable.

**Table 2 - Whitewood Ave - SSO Control Facility (Fort Slocum) (Outfall No. 5) - Discharges 2008-2015 -NYSDEC SPDES Permit No. NY-0026697[3]**

| Date | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD5 (mg/l) | Chlorine, Total Residual (mg/l) |
|------|-----------|----------------------|--------------------------|---------------------------|-----------------------|-------------|---------------------------------|
| 09/30/2008 | unreported | 41 | 59.1 | 0.3 | 0.3 | 38.6 | 1.3 |
| 06/30/2009 | unreported | 240000 | 42 | 0.1 | 18.6 | 50.2 | 1.1 |

---

[3] Sources: Westchester County, New York, Department of Environmental Facilities, New Rochelle Sanitary Sewer District, Overflow Retention Facility, Discharge Monitoring Report, June 2013; Westchester County, New York, Department of Environmental Facilities, New Rochelle Sanitary Sewer District, Overflow Retention Facility, Discharge Monitoring Report, 2014 Annual Summary; NYSDEC, SPDES Permit No. NY-0026697, DMRs 2008-2015.

| Date | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD5 (mg/l) | Chlorine, Total Residual (mg/l) |
|---|---|---|---|---|---|---|---|
| 03/31/2010 | 2 | 2000 | 34 | 0.1 | 33.6 | 45.8 | 0.7 |
| 03/31/2011 | 1 | 240000 | 14.6 | 0.1 | 8.4 | 24.4 | 1.9 |
| 08/30/2011 | 1 | 240000 | 32 | 0.1 | 12 | 43.8 | 1.6 |
| 09/30/2011 | 2 | 240000 | 19.5 | 0.1 | 7.2 | 22.3 | 1.1 |
| 09/30/2012 | unreported | 240000 | 28.6 | 0.1 | 9.7 | 29.2 | 0.6 |
| 06/30/2013 | 1 | 980 | 16.4 | 0.1 | 7.2 | 20 | 1.3 |
| 04/30/2014 | 2 | 240000 | 47 | 7.9 | 7.9 | 34.2 | 1.1 |

58.    Upon information and belief, Westchester County has not taken sufficient steps either to close these sanitary sewage overflow control facilities to prevent future discharges or to upgrade their treatment capabilities to ensure that they will meet mandated effluent discharge limitations.

59.    For more than 20 years, Defendant has been subject to various Consent Orders with New York State to ensure the County's compliance with the SPDES permits and the Act, including taking steps to address excess inflow and infiltration into the County's sanitary sewer system.  However, these Consent Orders, and the County's acts thereunder, have not resolved the issue, and Defendant is in violation of the terms of the 2008 Consent Order.  The following is a summary of the lengthy history of these Consent Orders.

60.     Order on Consent Case #3-2146/009, dated April 23, 1992 (1992 Consent Order), required Defendant to undertake inflow and infiltration evaluations and corrective actions to reduce inflow and infiltration in private, municipal and county sewer systems in the Blind Brook, Mamaroneck and New Rochelle Sewer Districts. The 1992 Consent Order provided that  in the event that a local municipality failed to comply with the standards for reducing inflow and infiltration, the county should undertake all administrative and judicial proceedings necessary to compel the municipality to comply with such standards. See 1992 Consent Order, Schedule of Compliance, pages 12-14.

61.     Subsequently, Order on Consent Case R3-3017/9808, dated August 17, 1998 (1998 Consent Order), specifically noted that the County had failed to take enforcement action against the municipalities to require the municipalities to remove inflow and infiltration in accordance with the legal standards.  The Order directed the County to "issue a Notice of Violation and Hearing, setting a hearing date in January of 1999 to each of the . . . municipalities no later than October 31, 1998, in accordance with Section 824.74-824.79 of the County Sewer Act. The [County] shall also issue a proposed Consent Order to each such municipality at that time (i.e., no later than October 31, 1998), and shall inform each municipality that it may avoid the administrative enforcement process by stipulating to such Consent Order." In the event that any municipality failed to stipulate to such order or entered into the order and subsequently failed to comply with such order, the Defendant was required to diligently commence enforcement proceedings. See 1998 Consent Order pages 9-10.

62.     In 2004, the State and the Defendant executed a Consent Order, Case No CO 3-20040603-130 (2004 Consent Order), imposing a nitrogen control requirement and requiring

treatment upgrades at the Mamaroneck and New Rochelle wastewater treatment plants and a "Inflow/infiltration investigation at the New Rochelle Sanitary Sewer District."

63.     The 2008 Consent Order, Case No. CO 3-20080730-65, revised the required upgrades at three of the four wastewater treatment plants (New Rochelle, Mamaroneck and Port Chester), and set certain interim limitations and conditions.

64.     To address inflow and infiltration, the 2008 Consent Order also required Westchester County to "develop flow reduction strategy" by October 1, 2013. Westchester County undertook a Flow Monitoring Program and reported the following:   "The main objective of this flow monitoring program was to determine which, if any, municipalities exceed the 150 gallons per capita per day [gpcd] flow rate limit. … The monitoring program lasted for 730 consecutive days. All municipalities exceeded the 150 gpcd, ranging from a low of 12% of the days during the monitoring program to a high of 61% of the days during the monitoring program."  See Table 3.

**Table 3 – Westchester Long Island Sound Municipalities, Flow Monitoring**[4]

| Municipalities | Days with Excessive I&I (above 150 GPCD) | Peak flow (GPCD) |
| --- | --- | --- |
| Harrison | 12% | 450 |
| Rye | 13% | 650 |
| White Plains | 14.7% | 600 |
| Mamaroneck (Town) | 27.8% | 900 |
| Rye Brook | 30.3% | 850 |
| Port Chester | 46% | 350 |
| New Rochelle | 49.7% | 900 |
| Pelham Manor | 56.2% | 900 |

---

[4] Flow Monitoring Program Report, Appendix A - Daily Per Capita Hydrographs for LIS Municipalities.

| Larchmont | 59% | 600 |
|---|---|---|
| Scarsdale | 59.3% | 900 |
| Mamaroneck (Village) | 61.4% | 900 |

65.     As required by the 2008 Consent Order, the Defendant developed a flow reduction strategy and submitted it to the NYSDEC.  The State approved the flow reduction strategy submitted by the Defendant in a letter dated June 25, 2013.

66.     The 2008 Consent Order provided that: "[i]f DEC approves the submission in whole, the submission shall be incorporated into this Order and Respondent shall implement it, in accordance with its schedules and term, as approved."  (See 2008 Consent Order, Section V. (C), p. 14).  Accordingly, the flow reduction strategy became a condition of the 2008 Consent Order and the County was required to implement it.

67.     The schedule for implementation of the Flow Reduction Strategy Plan in the Sewer Districts required the County to undertake several actions to reduce inflow and infiltration from municipalities, including the following: (1) complete negotiations with the municipalities by July 1, 2014; (2) submission and review of the municipalities' Evaluation Program Development between April 1, 2015 and August 31, 2015; and (3) implementation of the programs from September 1, 2015 through 2017.

68.     Upon information and belief, the County failed to complete negotiations with the municipalities by July 1, 2014, failed to receive and review the municipalities' programs to comply with the August 31, 2015 deadline, thus making it impossible to achieve implementation of these programs by 2017.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Unlawful Discharge of Pollutants
### (Violations of 33 U.S.C. §§ 1311, 1342)

69.    Save the Sound incorporates by reference all preceding paragraphs as if set forth herein.

70.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by a valid permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

71.    Section 502(12) of the Act, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

72.    Section 502(6) of the Act, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, chemical wastes, biological materials, rock, sand, and industrial waste discharged into water.

73.    Section 502(14) of the Act, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

74.    Section 502(7) of the Act, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."  Long Island Sound, and the rivers, streams, bays and other waters that flow into it are navigable waters of the United States.

23

75.     Defendant's Flint Ave. & Cherry Ave. - SSO Control Facility (SPDES Permit Number NY0026697, Outfall No. 3) located in the Village of Larchmont, which is part of the New Rochelle Sewer District, is a "point source" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), and discharges into Long Island Sound.

76.     Defendant's Whitewood Ave. - SSO Control Facility (Fort Slocum) (SPDES Permit Number NY0026697, Outfall No. 5) located in New Rochelle, is a "point source" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), and discharges into Long Island Sound.

77.     Discharges of partially treated sewage from the Defendant's overflow retention facilities in the New Rochelle Sanitary Sewer District contain pollutants within the meaning of Section 502(6), including, but not limited to, fecal coliform, settleable solids, suspended solids, biological oxygen demand, oil and grease, residual chlorine, and nitrogen.

78.     The discharge of these pollutants affects the health and abundance of fish and shellfish by retarding growth, and reducing available food sources. These pollutants also cause physical and chemical degradation to water quality which can adversely affect the aesthetic quality and dissolved oxygen levels of affected waters. Conditions of low dissolved oxygen (called "hypoxia'") or no dissolved oxygen (called "anoxia") threaten the abundance of healthy fish and shellfish in affected waters.

79.     Discharges from the Flint Ave. & Cherry Ave. and the Whitewood Ave. sanitary sewage overflow control facilities are regulated under the terms of SPDES Permit NY0026697.

80.     The Permit prohibits all discharges of pollution from these sanitary sewage overflow control facilities after August 1, 2014, unless those discharges meet the Clean Water Act's secondary treatment standards.

24

81.     On December 9 and 10, 2014 Defendant discharged nearly one million gallons of polluted water into Long Island Sound from the Flint Ave. & Cherry Ave. sanitary sewage overflow control facility.

82.     On information and belief, that discharge did not meet secondary treatment standards.

83.     Defendant has violated section 301(a), 33 U.S.C. § 1311(a), and section 402 of the Clean Water Act, 33 U.S.C. § 1342, by illegally discharging nearly one million gallons of pollution, including but not limited to fecal coliform, settleable solids, suspended solids, biological oxygen demand, and nitrogen, into Long Island Sound from its Flint Ave. & Cherry Ave. sanitary sewage overflow control facility located in the Village of Larchmont, which is part of the New Rochelle Sewer District, on December 9-10, 2014.

84.     Each and every day on which Defendant discharged pollution associated with its Flint Ave. & Cherry Ave. - SSO Control Facility (SPDES NY0026697, Outfall No. 003) without authorization under the SPDES permit is a separate and distinct violation of Section 301(a) and Section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

85.     Defendant's violations of the Act are ongoing and there is more than a reasonable likelihood of future violations of the SPDES permit.  From 2008 to the present, Defendant has discharged wastewater that does not meet secondary treatment standards 15 times from the Flint Ave. & Cherry Ave. sanitary sewage overflow control facility and 9 times from the Whitewood Ave. sanitary sewage overflow control facility in the New Rochelle Sewer District.  Moreover, Defendant has not undertaken sufficient steps to close these facilities or to upgrade their treatment capabilities to ensure compliance with its permit conditions.  Barring such action, future discharges from these facilities in violation of the SPDES permit are all but inevitable.

86.     Without the issuance of an injunction and the imposition of appropriate civil penalties, Defendant will continue to violate the Act and the SPDES permits for the Sanitary Sewer Districts to further injury of Save the Sound, its members, and Long Island Sound.

87.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of Long Island Sound, Save the Sound, and its members, for which harm Save the Sound has no plain, speedy, or adequate remedy at law

88.     Wherefore, Save the Sound prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Failure to Comply with SPDES Permit Conditions
### (Violations of 33 U.S.C. §§ 1311, 1342)

89.     Save the Sound incorporates by reference all preceding paragraphs as if set forth herein.

90.     Defendant violates the Act by failing to comply with the SPDES permits for its four Sanitary Sewer Districts, which require it to enforce the County Sewer Act and to remove excess inflow and infiltration to the extent that is economically feasible (including through enforcement of the County Sewer Act).

91.     Defendant's SPDES permits for its Sanitary Sewer Districts all state that the County "is authorized to discharge … in accordance with: effluent limitations, monitoring and reporting requirements, other provisions and conditions set for in this permit; and 6 NYCRR Part 750-1.2(a) and 750-2."

92.     6 NYCRR § 750-2.9 is fully incorporated into the four permits and requires, *inter alia*, that the County "shall enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the [publicly owned treatment works] service area." See 6 NYCRR § 750-2.9 (4).

26

93.     Defendant's past and continuing failure to enforce the County Sewer Act (Westchester County Administrative Code, Chapter 824) is a violation of each of the SPDES permits.

94.     Specifically, Defendant has failed and continues to fail to enforce the provision, under the County Sewer Act § 824.72, that municipalities may not introduce excessive inflow and infiltration into the county trunk sewer system of more than 150 gallons per capita per day.

95.     Defendant's own assessment concluded that all municipalities in the Sewer Districts have extraneous flows due to inflow and infiltration exceeding the 150 gpcd limit. And the peak levels of excessive inflow and infiltration above the legal 150 gpcd threshold were sixfold in some municipalities.

96.     Defendant's Flow Monitoring Program Report concluded that "I/I [inflow and infiltration] in the Westchester County Sewer Districts is a significant problem, contributing up to 50% of the flow to the WWTPs [wastewater treatment plants]. It is to be expected that the aging sewer systems will continue to deteriorate and I/I will continue to increase."

97.     Defendant has failed to take any significant measures in over a decade that actually reduced inflow and infiltration, and has failed to enforce the County Sewer Act despite rampant and continuing violations of excessive flows by every single municipality. For over a decade, Defendant has not brought administrative or judicial actions to enforce the County Sewer Act's provisions that govern flows, loads, and discharges into the Sewer Districts. Upon information and belief, the Defendant has not issued orders under the County Sewer Act, scheduled hearings, or levied fines.

27

98.     Upon information and belief, all municipalities in the Sewer Districts continue to have extraneous flows due to inflow and infiltration exceeding 150 gpcd on a frequent and regular basis.

99.     Defendant's violations of the SPDES permits are ongoing and continuous.

100.    Without the issuance of an injunction and the imposition of appropriate civil penalties, Defendant will continue to violate the Act and the SPDES permits for the Sewer Districts to further injury of Save the Sound, its members, and Long Island Sound.

101.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of Long Island Sound, Save the Sound, and its members, for which harm Save the Sound has no plain, speedy, or adequate remedy at law.

102.    Save the Sound, Plaintiff prays for relief as hereinafter set forth.

**THIRD CAUSE OF ACTION**

**Failure to Comply with Conditions in an Order issued by the State with Respect to an Effluent Standard or Limitation
(Violations of 33 U.S.C. § § 1311, 1342)**

103.    Save the Sound incorporates by reference all preceding paragraphs as if set forth herein.

104.    The citizen suit provision of the Clean Water Act, section 505(a)(1), 33 U.S.C. § 1365(a)(1), authorizes any citizen to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation'' or "an order issued by the Administrator or a State with respect to such a standard or limitation."

105.    The 2008 Consent Order is an order issued by a State with respect to effluent standards and limitations contained in the Defendant's four SPDES permits.

106.    The 2008 Consent Order required Defendant to develop a flow reduction strategy.

107.    Pursuant to the 2008 Consent Order, Defendant developed and submitted its flow reduction strategy to the State, and received the State's approval in a letter dated June 25, 2013.

108.    The 2008 Consent Order states: "[i]f DEC approves the submission in whole, the submission shall be incorporated into this Order and Respondent shall implement it, in accordance with its schedules and term, as approved."  (See 2008 Consent Order, Section V. (C), p. 14).

109.    Thus, once the flow reduction strategy and schedule were accepted by New York State, they became part of the 2008 Consent Order.

110.    Defendant's flow reduction strategy includes a schedule for implementation that requires the Defendant to undertake several actions, including the following: (1) complete negotiations with the municipalities by July 1, 2014; (2) submission and review of the municipalities' Evaluation Program Development between April 1, 2015 and August 31, 2015; and (3) implementation of the programs September 1, 2015 through 2017.

111.    Defendant did not complete negotiations with the municipalities by July 1, 2014.

112.    Defendant did not order the municipalities to develop and submit Evaluation Programs by April 1, 2015.

113.    As of the date of the filing of this complaint, Defendant has not received a plan for an Evaluation Program from any municipality.

114.    Defendant cannot meet the scheduled date of August 31, 2015 – less than three weeks from today – to complete its review of Evaluation Programs.

115.    Defendant will not be able to ensure implementation of reviewed and approved Evaluation Programs beginning on September 1, 2015.

116.    Defendant is far off-track and cannot reasonably ensure that all of the municipal Evaluation Programs will be implemented and concluded by September 1, 2017.

117.    Thus, Defendant is violating the 2008 Consent Order, and thus violates Section 402 of the Act, 33 U.S.C. § 1342.

118.    Defendant's violations of the 2008 Consent Order are ongoing and continuous.

119.    Without the issuance of an injunction and the imposition of appropriate civil penalties, Defendant will continue to violate the 2008 Consent Order.

120.    Continuing commission of the acts and omissions alleged herein irreparably harms the waters of Long Island Sound, Save the Sound, and its members, for which harm Save the Sound has no plain, speedy, or adequate remedy at law.

121.    Wherefore, Save the Sound prays for relief as hereinafter set forth.

## VII.    PRAYER FOR RELIEF

Wherefore, Save the Sound respectfully requests that this Court grant the following relief:

(a)    Declare that the Defendant has violated and continues to be in violation of the Act as alleged herein;

(b)    Enjoin Defendant from discharging pollutants from the Flint Ave. & Cherry Ave. and the Whitewood Ave. sanitary sewage overflow control facilities except as authorized by and in compliance with the SPDES permit;

(c)    Order Defendant to immediately comply fully with all applicable requirements of the SPDES permits and the 2008 Consent Order;

(d)    Order Defendant to take appropriate actions to restore the quality of the waters impaired by its activities;

(e)      Order Defendant to pay civil penalties of $37,500 per day per violation for all violations of the Act occurring after January 12, 2009, pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1–19.4;

(f)      Award Plaintiffs' costs (including reasonable investigative, attorney, witness, and consultant fees) in accordance with Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and,

(g)      Award such other relief as this Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated this 11th day of August, 2015

                                        Respectfully submitted,


                                        /s/ *Robert N. Kaplan*
                                        Robert N. Kaplan
                                        Richard J. Kilsheimer
                                        Elana Katcher
                                        Kaplan Fox & Kilsheimer LLP
                                        850 Third Avenue, 14th Floor
                                        New York, NY 10022
                                        212-687-1980
                                        Attorneys for Plaintiff

                                        Of Counsel:

                                        Roger Reynolds, Legal Director
                                        Connecticut Fund for the Environment, Inc.
                                        /Save the Sound
                                        142 Temple Street
                                        New Haven, Connecticut 06510
                                        (203) 787-0646

Reed Super
Edan Rotenberg
Super Law Group, LLC
411 State Street, 2R
Brooklyn, New York 11217
212-242-2355

Victor M. Tafur
Law Offices of Victor M. Tafur
490 Bleeker Avenue
Mamaroneck, NY 10543
917-752-0710

**Appendix A**

**SAVE THE SOUND**

**Acronyms & Abbreviations**

| | |
|---|---|
| CWA | Clean Water Act |
| DMR | discharge monitoring report |
| GPCD | gallons per capita per day |
| I/I or I&I | inflow and infiltration |
| MGD | million gallons per day |
| NPDES | National Pollutant Discharge Elimination System |
| NYSDEC | New York State Department of Environmental Conservation |
| ORFs | Overflow Retention Facilities |
| POTW | publicly owned treatment works |
| SPDES | State Pollutant Discharge Elimination System |
| SSO | sanitary sewage overflow |
| TMDL | Total Maximum Daily Load |
| WCDEF | Westchester County Department of Environmental Facilities |
| WWOP | Wet Weather Operations Plans |
| WWTP | waste water treatment plant |