# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

SAVE THE SOUND and ATLANTIC CLAM FARMS
OF CONNECTICUT, INC.,
           Plaintiffs,

v.

WESTCHESTER COUNTY, NEW YORK;
TOWN/VILLAGE OF HARRISON; VILLAGE OF
LARCHMONT; TOWN OF MAMARONECK; CITY
OF NEW ROCHELLE; VILLAGE OF PELHAM
MANOR; CITY OF RYE; VILLAGE OF RYE
BROOK; and VILLAGE OF SCARSDALE,
           Defendants.

------------------------------------------------------------

Case No. 7:15-cv-06323

**SECOND AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELEIF AND
CIVIL PENALTIES**

(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251–1387)

JURY DEMAND

Plaintiffs Save the Sound and Atlantic Clam Farms of Connecticut, Inc. (collectively, "Plaintiffs") bring this "citizen suit" under Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), against Westchester County (the "County") and the Town/Village of Harrison, Village of Larchmont, Town of Mamaroneck, City of New Rochelle, Village of Pelham Manor, City of Rye, Village of Rye Brook, and Village of Scarsdale (the "Municipality Defendants") (collectively, "Defendants") to address and abate their continuing violations of the Clean Water Act and to enjoin and abate common law nuisance that was caused and continues as a result of Defendants' unlawful discharges of pollution.

## I.      INTRODUCTION

1.      Long Island Sound (the "Sound") is a unique estuary that has two connections to the sea and receives the flow of several major rivers that drain fresh water from New England as far as the U.S. border with Quebec.  The Sound provides feeding, breeding, nesting, and nursery areas for a diversity of plant and animal life, including 1,200 species of invertebrates, 170 species

1

of fish, and dozens of species of migratory birds. It contributes $8.5 billion annually (adjusted for inflation in 2009 dollars) to the regional economy from boating, commercial and sport fishing, swimming, and sightseeing. Nearly nine million people live in the Sound's watershed, which includes the north shore of Long Island, the Westchester County eastern coastline, and the entire coastline of Connecticut. In 1987, the Sound was designated an Estuary of National Significance.

2.     But Long Island Sound is no longer a jewel. As a result of pollution, the Sound— especially the western portion, which borders Westchester County—is suffering ever increasing degradation in water quality, leading to low shellfish harvests and the closure of shellfish beds, depletion of fishing stocks and fish consumption advisories, periodic beach closures, restrictions on recreational activities, low dissolved oxygen ("hypoxia"), pathogen contamination, toxic contamination, and floatable debris. This degradation adversely impacts businesses, public health, recreation, and aesthetics.

3.     For example, hypoxia can have serious adverse consequences for a marine ecosystem, as marine organisms need oxygen to live. Certain pollutants (referred to as "biological oxygen demand," "$BOD_5$," or "$CBOD_5$") are known to contribute to hypoxia in Long Island Sound. The United States Environmental Protection Agency ("EPA") has studied this problem for years and found that hypoxia is a chronic condition in the western portion of the Sound—occurring in 90% to 100% of the years of the study period from 1994 to 2019. *See Frequency of Hypoxia*, LONG ISLAND SOUND STUDY (Jan. 1, 2020), https://longislandsoundstudy.net/2020/01/frequency-of-hypoxia-2/ (map provided *infra*, p.3).



4.    A substantial source of pollution in the Sound comes from cracked sanitary sewer pipes.  These pipes are supposed to transport sanitary wastewater from homes, businesses, public toilet facilities, and other locations to wastewater treatment plants, for removal of pollutants to make the water safe for discharge into the environment.  However, because of their deteriorated condition, these sewer pipes overfill with stormwater—which would flow through separate storm drains in a properly-maintained system—causing sanitary sewage overflows and sewage discharges into the Sound and its tributaries.

5.    The Clean Water Act was enacted in 1972 and it, along with its amendments over the years, mandates that our nation's waterbodies be made clean.  For Long Island Sound, this means that it must meet water quality standards that make it safe for fish, shellfish, humans, and

all other species that live on it, in it, and near it.  Although it was understood that polluted waters could not be made clean overnight, through a multi-year process of limiting pollutants, the waters of the United States would ultimately become and remain clean.  The Clean Water Act and other federal environmental laws form a comprehensive scheme, which mandate that we have a clean environment.  Our country made a choice decades ago that unabated pollution entering our air and water was unacceptable.

6.      Sadly, nearly fifty years after the enactment of the Clean Water Act, Long Island Sound (including its harbors and tributaries) is a polluted water body, and it is getting worse.  Most of the Sound's coastal reaches of Westchester County are classified by the EPA as "impaired" for bacterial or pathogenic pollution—meaning it is considered chronically unsafe for swimming and fishing due to excess pollution.

7.      It is well known that, to meet the mandate of the Clean Water Act, the entire sanitary sewage system (including the sewage treatment plants and the pipes that transport sanitary effluent to those plants) must be built and maintained in good working order.  In a well-designed and maintained system, only the wastewater from homes and businesses would be transported through sanitary sewer pipes for treatment at the sewage treatment plants, which would then discharge the cleansed water into a receiving water, such as Long Island Sound.  However, when the sanitary sewage system is ill-designed or not maintained, pipes become porous due to cracks and breaks. This allows rainwater to enter the system, especially during heavy rains, leading to flow beyond the capability of the treatment plants to effectively treat.  Untreated or only partially treated wastewater then escapes the system and enters the Sound.  This is referred to as a "sanitary sewer overflow," or "SSO."  Sanitary sewer pipes in Westchester County were mostly installed either when the streets were initially built, in many cases more than 100 years ago, or when a connection

was added to a new business or residence when the building was constructed. Over time, all of these pipes have deteriorated, leading to cracks and breaks in the system.

8.      This case is not about new and advanced technologies. It is about insisting on basic inspection, maintenance, and upgrading of the sanitary sewer systems to meet basic health standards. New York State, Westchester County, and the municipalities that are connected to the County's sewer system recognized almost 20 years ago that sanitary sewer pipes were degrading and needed to be inspected, repaired, and maintained. However, the steps that have been taken since then have been (and were known to be) insufficient to materially correct the problem—which is getting worse. This case seeks to force Defendants to take steps necessary to comply with the mandates of the Clean Water Act and remediate their damage to Long Island Sound.

**A.      Illegal discharges of partially treated sewage in the New Rochelle Sewer District.**

9.      Defendants Westchester County, City of New Rochelle, Town of Mamaroneck, Village of Larchmont, and Village of Pelham Manor have violated and continue to violate Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, by illegally discharging pollution—including but not limited to fecal coliform, settleable solids, suspended solids, biological oxygen demand, and nitrogen—into Long Island Sound from the Flint Ave. & Cherry Ave. – SSO Control Facility located in the Village of Larchmont, which is part of the New Rochelle Sewer District. At the time of filing the First Amended Complaint, the most recently documented incident of discharge (which is not authorized by, and violates the specific terms of, the pertinent State Pollutant Discharge Elimination System ("SPDES") Permit [1] ) was the continuation of a series of discharges from this and another similar facility over the last seven years. The most recently documented incident of discharge today (at the time of filing this Second

---

[1] A glossary of acronyms and abbreviations referenced in this Amended Complaint is attached as Appendix A.

Amended Complaint) occurred a mere six-and-a-half months ago. Given the repeated occurrences of these discharges (especially in heavy rainfall conditions) and the complete failure to either close these facilities or rebuild them to provide the level of treatment mandated by the permit, future violations are inevitable.

**B.**    **Failure to comply with SPDES permit conditions that require Westchester County to enforce the County Sewer Act to limit excessive flows from municipalities.**

10.    Westchester County is violating the Clean Water Act by failing to comply with a requirement of the SPDES permits for the New Rochelle, Mamaroneck, Blind Brook, and Port Chester Sewer Districts, all of which provide that Westchester County, as the named permittee, "is authorized to discharge … in accordance with: effluent limitations, monitoring and reporting requirements, other provisions and conditions set for in this permit; and 6 NYCRR Part 750-1.2(a) and 750-2."

11.    Each Sewer District is a publicly-owned treatment works ("POTW"), as defined by Section 212 of the Clean Water Act, 33 U.S.C. § 1292, and 6 NYCRR § 750-2.9, which was incorporated into the permits, and which requires that the County remove excess inflow and infiltration that threaten proper functioning of the sewer system and "shall enact, maintain and enforce" an effective sewer use law.

12.    Westchester County has failed and continues to fail to enforce the County Sewer Act (Westchester County Administrative Code, Chapter 824), which is a violation of each of the SPDES permits for the Sewer Districts. Specifically, the County has failed and continues to fail to enforce the requirement, under the County Sewer Act § 824.72, that municipalities may not introduce excessive inflow and infiltration into the county trunk sewer system. Excessive inflow and infiltration (referred to as "I/I" or "I&I"), as defined in the County Sewer Act, means the "quantity of flow entering the county sewer system which is greater than 150 gallons per capita

6

per day ["gpcd"] for the population served by the tributary sewer systems located within a municipality's borders."

13.      In a 2009–2011 flow monitoring conducted by the County, which was approved by the New York State Department of Environmental Conservation ("NYSDEC"), Westchester County concluded that all municipalities in the Sewer Districts have extraneous flows due to inflow and infiltration that exceeded the 150 gpcd threshold.  Further, the County has conceded that "I/I in the Westchester County Sewer Districts is a significant problem, contributing up to 50% of the flow to the WWTPs [wastewater treatment plants]. It is to be expected that the aging sewer systems will continue to deteriorate and I/I will continue to increase."  Upon information and belief, all municipalities in the Sewer Districts that discharge into Long Island Sound continue to have extraneous flows due to inflow and infiltration exceeding 150 gpcd, since little or nothing has been done to effectively address this issue.  And Westchester County has failed to take the steps necessary to compel compliance with the limitations as required by its SPDES permits.

**C.      Failure to implement state-mandated flow reduction requirements with municipalities in the Sewer Districts.**

14.      Westchester County is violating the terms of an Order on Consent in Case No. CO 3-20080730-65, executed between the County and the New York State Department of Environmental Conservation in December 2008 ("2008 Consent Order"), which required the County to develop and implement a Flow Reduction Strategy Plan in the Sewer Districts.  The County submitted such a schedule in the Flow Monitoring Program Report that was accepted by the State.  The 2008 Consent Order provided that if the State approved the submission, the schedule would be incorporated into the Consent Order, and the County was required to implement it.  Thus, once the schedule was accepted by New York State, it became part of the 2008 Consent Order and is enforceable through a citizen suit under Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

15.    The schedule incorporated into the 2008 Consent Order contained several milestones for the reduction of inflow and infiltration from municipalities into the County's sanitary sewer system.  However, the County has failed to timely complete the steps required, thus rendering compliance with the schedule impossible.

**D.    Unpermitted discharges from sanitary sewer overflows.**

16.    Unpermitted discharges of sewage are caused by the Defendants' failure to properly maintain their sewer infrastructure, including their failure to prevent excessive inflow and infiltration.  Large volumes of extraneous flow cause sanitary sewers to back-up and overflow, resulting in SSOs from manholes or other points in the system.  When SSOs reach waters of the United States, they constitute unpermitted discharges of pollution in violation of Section 301 of the Clean Water Act.

17.    Analysis of publicly available data from 2010 through November 4, 2015 evidenced at least 81 SSOs in Westchester County's Long Island Sound Sewer Districts, of which at least 45 discharges reached the waters of the United States.  *See* Appendix B.

18.    Analysis of publicly available data from November 5, 2015 through June 30, 2020 evidences at least 57 SSOs in Westchester County's Long Island Sound Sewer Districts that reached the waters of the United States.  *See* Appendix C.

19.    The number and extent of these SSOs demonstrates a recurrent, systemic, and ongoing problem, caused in large part by excessive inflow and infiltration in the subject sanitary sewer systems.

**E.    Municipal separate storm sewer system permit violations by certain municipalities.**

20.    Each of the Municipality Defendants maintains a separate sewer system to collect and discharge stormwater, separate from the sanitary sewer system.  These systems are referred to as "municipal separate storm sewer systems" ("MS4s").  Each municipality operates its MS4

system pursuant to an MS4 permit issued by the NYSDEC.  That permit prohibits the discharge of sewage from the municipality's MS4 system.

21.    On numerous occasions, SSOs have resulted in the introduction of sewage into MS4 systems of many of the Municipality Defendants, in violation of their MS4 permits.  Such violations of the MS4 permits constitute violations of the Clean Water Act.

**F.    SPDES permit violations in the Blind Brook and Port Chester Sanitary Sewer Districts.**

22.    The SPDES permits for each of the treatment plants that discharge into the Sound contain specific limitations of various parameters in the discharge, including flow, biological oxygen demand, suspended solids, settleable solids, fecal coliforms, metals, etc.  Every entity holding a SPDES permit is required to sample its discharges periodically and report the results of its analysis by submitting discharge monitoring reports ("DMRs"), including all instances where the effluent limitations that are contained in the permit have been exceeded.

23.    DMR data submitted by Westchester County for the treatment plants serving the Blind Brook and Port Chester Sanitary Sewer Districts show that the SPDES permit effluent limits were exceeded on a number of occasions at those facilities.  Each exceedance constitutes a violation of Sections 301 and 402 of the Clean Water Act.

24.    The Defendants responsible for each violation at a treatment plant include Westchester County as the named permittee for each treatment plant, as well as those Municipality Defendants whose discharge of pollution through the treatment plant violates the terms of the plant's SPDES permit.  Thus, the parties responsible for violations of the effluent limits contained in the Blind Brook Sanitary Sewer District SPDES permit are Westchester County and the four municipalities that discharge pollution through the Blind Brook treatment plant in violation of the permit's terms: the City of Rye, the Town/Village of Harrison, the Village of Mamaroneck, and

the Village of Rye Brook.  Similarly, Westchester County and the Village of Mamaroneck, the

Village of Port Chester, and the Village of Rye Brook—the three municipalities that discharge

pollution through the Port Chester treatment plant in violation of the Port Chester Sanitary Sewer

District SPDES permit—are all legally responsible for violations of that permit.

**G.**    **Public nuisance based upon the discharge of pollutants into Long Island Sound causing the degradation of its waters.**

25.    The violations by Westchester County and the Municipality Defendants of the

SPDES permits and the MS4 permits have resulted in the discharge of pollutants into Long Island

Sound and its tributaries.  The effect of these discharges has been the severe degradation of the

waters of Long Island Sound, leading to beach closures, the destruction of shellfishing in the

western Sound, the depletion of fish stocks, and other public harm.  These effects constitute a

public nuisance for which Plaintiffs seek relief.

## II.    JURISDICTION AND VENUE

25.    This court has subject matter jurisdiction over the claims set forth in this Amended

Complaint pursuant to Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), 28 U.S.C.

§ 1331 (an action arising under the laws of the United States), 28 U.S.C. § 1332 (diversity of

citizenship), and 28 U.S.C. § 1367 (supplemental jurisdiction).

26.    On June 11, 2015, Save the Sound, Inc. (at the time Save the Sound was known as

Connecticut Fund for the Environment, Inc. ("CFE"), d/b/a "Save the Sound," but has since

changed its name to Save the Sound), gave notice of certain violations and of its intent to file suit

to the NYSDEC, the Administrator of the EPA, the Regional Administrator of EPA Region 2, and

Westchester County, as required by Section 505(b)(1) of the Clean Water Act, 33 U.S.C. §

1365(b)(1).

27.    On August 11, 2015, after more than 60 days had passed since that notice was served, as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), Save the Sound filed its initial complaint against Westchester County, alleging certain violations of the Clean Water Act.  ECF 1.

28.    On August 7, 2015Save the Sound gave notice of additional violations and of its intent to file suit to the NYSDEC, the Administrator of the EPA, the Regional Administrator of EPA Region 2, Westchester County, and each of the Municipality Defendants, as required by Section 505(b)(1) of the Clean Water Act, 33 U.S.C. § 1365(b)(1).

29.    On October 29, 2015, Soundkeeper, Inc. ("Soundkeeper") and Atlantic Clam Farms of Connecticut, Inc. ("Atlantic Clam") gave notice of additional violations and of their intent to file suit to the NYSDEC, the Administrator of the EPA, the Regional Administrator of EPA Region 2, and each of the Municipality Defendants, as required by Section 505(b)(1) of the Clean Water Act, 33 U.S.C. § 1365(b)(1).  That notice was substantially the same as the June 11, 2015 and August 7, 2015 notices that were sent by Save the Sound.

30.    On November 4, 2015, after more than 60 days had passed since Save the Sound's notice was served, as required by Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), Save the Sound, Soundkeeper, and Atlantic Clam jointly filed an amended complaint against Westchester County and the Municipal Defendants, alleging further violations of the Clean Water Act.  ECF 16.

31.    As of the date of the filing of this Second Amended Complaint, neither EPA nor NYSDEC has commenced or diligently prosecuted a court action to redress violations under Section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B), or issued an administrative penalty action that would preempt this action under Section 309(g)(6)(A) of the Clean Water Act, 33 U.S.C. § 1319(g)(6)(A).

32.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) in that all Plaintiffs and all Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000.

33.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over claims not arising under federal law because they are so related to the federal law claims that they form part of the same case or controversy.

34.    Venue is appropriate in the Southern District of New York under Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the sources of the alleged violations are located within this judicial district.

### III.    PARTIES

35.    Plaintiff Save the Sound, Inc., formerly Connecticut Fund for the Environment, is a 501(c)(3) not-for-profit corporation incorporated under the laws of the State of Connecticut, with a principal place of business at 142 Temple Street, Suite 305, New Haven, CT 06510, and a New York office located at 545 Tompkins Avenue, 3rd Floor, Mamaroneck, NY 10543.

36.    Connecticut Fund for the Environment, Inc, ("CFE"), at the time the lawsuit was brought, was a 501(c)(3) not-for-profit corporation founded in 1978, incorporated under the laws of the State of Connecticut.  In 2004, CFE merged with Save the Sound—which was formed in 1972 as the Long Island Sound Taskforce—and the combined entity known as CFE operated "Save the Sound" as a program of CFE, which was registered to do business in New York State as "Save the Sound".  In 2020, CFE formally changed its name to Save the Sound, Inc.  *See* ECF 140 (granting motion to amend caption).

37.    Soundkeeper was a member-supported, not-for-profit organization, formed under the laws of the State of Connecticut.  Soundkeeper was founded in 1987 by the shellfishing and fisheries communities to combat the progressive pollution and destruction of habitat in the Sound.

Among other things, Soundkeeper's priorities included the protection of commercial fishing, which is an essential component of our food supply. In 2020, Soundkeeper merged with Save the Sound. *See* ECF 140 (granting motion to amend caption). All three organizations (CFE, Soundkeeper and "Save the Sound") are now known as Save the Sound, Inc.

38.    Save the Sound's primary purpose is to conserve and enhance the biological integrity of Connecticut's and New York's air, land, and water resources, including Long Island Sound. Save the Sound uses legal and scientific expertise, advocacy, and education in furtherance of its purpose to achieve results that benefit the environment for current and future generations.

39.    Save the Sound represents approximately 3,500 member households, many of whom use and enjoy Long Island Sound and its tributary rivers and streams. Save the Sound's members include a broad cross-section of the public, including members who live on or near the Sound and enjoy swimming, boating, fishing, birding and wildlife viewing, photography, engaging in spiritual reflection, engaging in nature and scientific study, and otherwise enjoying or recreating in and around the Sound and its tributaries. Other Save the Sound members rely on the Sound and its tributaries for income, such as commercial fishermen, boaters, and swimmers; marine industry members; shellfish harvesters, and tourist companies that facilitate recreational activities on and around the Sound. Save the Sound's members share a common concern for the quality of Long Island Sound, its tributaries, and its surroundings. The quality of the Sound and its tributaries directly affect the health, recreational, aesthetic, commercial, and environmental interests of Save the Sound's members.

40.    Plaintiff Atlantic Clam Farms of Connecticut, Inc. ("Atlantic Clam") is a corporation organized under the laws of the State of Connecticut, with a principal place of business at 335 Westport Road, Easton, CT 06612. Atlantic Clam is engaged in the business of commercial shellfishing in Long Island Sound, primarily in underwater lots off the Connecticut shoreline it

leases from the State of Connecticut. Since the shellfishing beds in the western part of the Sound have been closed, due to the pollutants that have been discharged into those waters, Atlantic Clam has been prohibited from commercial shellfishing in the area of the Sound adjacent to the Westchester coastline. Atlantic Clam now maintains Connecticut's westernmost clam beds, just east of and adjacent to the Westchester County, New York–Connecticut border, and operates boats out of the Byram River.

41.     Poor water quality in Long Island Sound off the Westchester County coastline directly affects the economic and commercial interests of Atlantic Clam. Being unable to commercially harvest shellfish from its beds adjourning Westchester County diminishes Atlantic Clam's revenue. In addition, the poor water quality in the western Long Island Sound adversely affects Atlantic Clam's business by increasing its costs in adjacent Connecticut waters. For example, for certain of its lots (known as "restricted relay lots"), its clams must be taken from those lots to other leased lots and replanted in cleaner water to flush pollutants for varying periods of time—sometimes as long as six months—before being harvested and brought to market.

42.     Save the Sound and Atlantic Clam are "citizens" for purposes of Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and file this citizen suit on behalf of themselves and, in the case of Save the Sound, its members.

43.     The acts and omissions by Defendants alleged herein cause or contribute to pollution levels in waters used and enjoyed by Save the Sound's members and by Atlantic Clam, which are injurious to human health, wildlife, the aesthetic quality of those waters, commercial activities in or around Long Island Sound, and other uses pursued and enjoyed by Plaintiffs. The acts and omissions alleged herein threaten the health and welfare of Save the Sound's members and Atlantic Clam, impair and threaten their use and enjoyment of the Sound and its tributaries, deny them the level of water quality to which they are entitled under the Clean Water Act, and

14

deprive them of the procedural rights and protections provided under the Clean Water Act. Plaintiffs have an interest that is adversely affected by the Defendants' illegal discharges and violations.

44.     The relief sought herein will redress the harms to Plaintiffs caused by Defendants' conduct.  The continuing nature of the acts and omissions alleged herein will lead to irreparable harm to Plaintiffs, for which harm they have no plain, speedy or adequate remedy at law.

45.     Defendant Westchester County, New York is the entity holding the State-issued permits for the Sewer Districts that discharge into Long Island Sound.

46.     Defendant Town/Village of Harrison is a municipal corporation located in Westchester County, New York.  The Town/Village of Harrison uses the Blind Brook Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

47.     Defendant Village of Larchmont is a municipal corporation located in Westchester County, New York.  The Village of Larchmont uses the New Rochelle Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

48.     Defendant Town of Mamaroneck is a municipal corporation located in Westchester County, New York.  The Town of Mamaroneck uses the New Rochelle Sanitary Sewer District and the Mamaroneck Sanitary Sewer District, both of which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

49.     The Village of Mamaroneck is a municipal corporation located in Westchester County, New York.  The Village of Mamaroneck uses the Mamaroneck Sanitary Sewer District and the Blind Brook Sanitary Sewer District, both of which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

Plaintiffs stipulated to the dismissal of the Village of Mamaroneck by a consent order entered by the Court on November 8, 2017. ECF 92. The Court retains continuing jurisdiction to enforce the terms of this consent order. ECF 92, ¶ 12.

50.    Defendant City of New Rochelle is a municipal corporation located in Westchester County, New York. The City of New Rochelle uses the New Rochelle Sanitary Sewer District and the Mamaroneck Sanitary Sewer District, both of which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

51.    Defendant Village of Pelham Manor is a municipal corporation located in Westchester County, New York. The Village of Pelham Manor uses the New Rochelle Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

52.    The Village of Port Chester is a municipal corporation located in Westchester County, New York. The Village of Port Chester uses the Port Chester Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound. Plaintiffs stipulated to the dismissal of the Village of Port Chester by a consent order entered by the Court on October 11, 2017. ECF 87–88. The Court retained jurisdiction to enforce the terms of that consent order, and an amended consent order was entered on April 27, 2020. ECF 142. The Court retains continuing jurisdiction to enforce the terms of this consent order. ECF 142, ¶ 16.

53.    Defendant City of Rye is a municipal corporation located in Westchester County, New York. The City of Rye uses the Blind Brook Sanitary Sewer District and the Port Chester Sanitary Sewer District, both of which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

54.     Defendant Village of Rye Brook is a municipal corporation located in Westchester County, New York.  The Village of Rye Brook uses the Blind Brook Sanitary Sewer District and the Port Chester Sanitary Sewer District, both of which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

55.     Defendant Village of Scarsdale is a municipal corporation located in Westchester County, New York.  The Village of Scarsdale uses the Mamaroneck Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.

56.     The City of White Plains is a municipal corporation located in Westchester County, New York.  The City of White Plains uses the Mamaroneck Sanitary Sewer District, which it co-operates with the County and certain of the other Municipality Defendants, to discharge sewage into Long Island Sound.  Plaintiffs stipulated to the dismissal of the City of White Plains by a consent order entered by the Court on October 23, 2018.  ECF 113.  The Court retains continuing jurisdiction to enforce the terms of this consent order.  ECF 113, ¶ 11.

## IV.    STATUTORY BACKGROUND

### FEDERAL CLEAN WATER ACT

57.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  Clean Water Act § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Clean Water Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

58.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into navigable waters of the United States, unless in compliance with various enumerated sections of the Clean Water Act. Discharges not authorized by, or in

violation of, the terms of a permit issued by the EPA or a designated State agency are prohibited under Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

59.    Under Section 402(a) and (b) of the Clean Water Act, 33 U.S.C. § 1342(a), (b), the Administrator of the EPA has authorized the New York State Department of Environmental Conservation to implement a permitting program in New York, which is known as the State Pollution Discharge Elimination System ("SPDES") program.

60.    Section 308 of the Clean Water Act, 33 U.S.C. § 1318, requires permittees to maintain records, install, use, and maintain monitoring equipment, sample effluent, and report regularly to the permit-issuing agency regarding the facility's discharge of pollutants.  The reports are called Discharge Monitoring Reports ("DMRs").

61.    The citizen suit provision of the Clean Water Act, Section 505(a)(1), 33 U.S.C. § 1365(a)(1), authorizes any citizen to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation" or "an order issued by the Administrator or a State with respect to such a standard or limitation."

62.    Such enforcement action under the Clean Water Act includes an action seeking remedies for an unpermitted discharge in violation of Section 301 of the Clean Water Act, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to Sections 402 and 505(f) of the Clean Water Act, 33 U.S.C. § § 1342, 1365(f), and "an order issued by the Administrator or a State with respect to such a standard or limitation" under Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1).  As set forth in the amended complaint and this Second Amended Complaint, Defendants are causing unpermitted discharges, are in violation of permit conditions, and are in violation of a duly issued order requiring compliance with standards and limitations.

18

63.    Declaratory relief in this case is authorized by 28 U.S.C. § 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

64.    Injunctive relief is authorized by Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a).

65.    Violators of the Clean Water Act are also subject to an assessment of civil penalties of up $37,500 per day per violation for violations occurring after January 12, 2009 and up to $44,800 for violations occurring after November 2, 2015.  33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## NEW YORK STATE LAWS AND REGULATIONS

66.    New York State Department of Environmental Conservation is charged with protecting the waters of the State pursuant to the Environmental Conservation Law, Article 17, and the State's SPDES permit program.

67.    The NYSDEC has issued regulations, under 6 NYCRR Part 750, that provide for "Obtaining A SPDES Permit" and "Operating In Accordance With A SPDES Permit."  See 6 NYCRR Subparts 750-01 and 750-02.

68.    "Infiltration" is defined in the state regulations to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from the ground through such means as defective pipes, pipe joints, connections, or manholes.  Infiltration does not include and is distinguished from inflow."  6 NYCRR § 750-1.2(45).

69.    "Inflow" is defined to mean "water other than wastewater that enters a sewerage system (including sewer service connections) from sources such as roof leaders, cellar drains, yard drains, area drains, foundation drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers, process and sanitary sewers, catch basins, cooling

19

towers, stormwaters, surface runoff, street washwaters, or drainage.  Inflow does not include, and is distinguished from infiltration." 6 NYCRR § 750-1.2(46).

70.    A SPDES permittee that operates a publicly owned treatment works ("POTW") has an obligation, *inter alia*, to "enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the POTW service area.  Such enactment and enforcement shall include intermunicipal agreements and/or other enforceable legal instruments that allow the permittee to control discharges, either directly or through jurisdictions contributing flows to the POTW, flow and loads to the POTW as well as discharges to the POTW." 6 NYCRR § 750-2.9 (4).

71.    New York State's regulations define a POTW as "any device or system used in the treatment (including recycling and reclamation) of municipal sewage that is owned by a municipality.  This definition includes sewers, pipes, or other conveyances only if they convey wastewater to a POTW providing treatment."  6 NYCRR § 750-1.2(a)(68).  This definition of a POTW is a near-verbatim codification of the definition adopted in the federal Clean Water Act. *See* 40 C.F.R. § 403.3(q), *see also* 33 U.S.C. § 1292(2)(A), (B).

## WESTCHESTER COUNTY'S REGULATORY FRAMEWORK

72.    Westchester County's sewer use law is the County's Environmental Facilities Sewer Act (County Sewer Act) and is incorporated into each of the SPDES permits for the sewer districts that discharge into Long Island Sound.  *See* Westchester County Administrative Code, Chapter 824.

73.    Section 824.72 of the County Sewer Act includes a specific "[p]rohibition of introduction by municipalities of excessive inflow and infiltration into the county trunk sewer system," and sets forth several standards, monitoring obligations, and penalties.  Among other things it provides: "Excessive infiltration and inflow means the quantity of flow entering the

county sewer system which is greater than 150 gallons per capita per day for the population served by the tributary sewer systems located within a municipality's borders."  Westchester County Administrative Code § 824.72(2).

74.    Section 824.72 of the County Sewer Act also requires that "[m]unicipalities shall have a continuing obligation to maintain and repair the tributary sewer systems within their borders such that they comply with the standards set forth in this section and shall annually file copies of all plans for such maintenance and repair program with the Commissioner of Environmental Facilities by September first of each year." Westchester County Administrative Code, § 824.72(7).

## V.    STATEMENT OF FACTS

### A.  Sanitary wastewater systems and health risks of raw sewage.

75.    Wastewater flow in a sanitary sewer collection system consists of base sanitary flow, groundwater infiltration, dry weather inflow, and rainfall derived inflow and infiltration (I/I). Infiltration results from groundwater seepage into the sanitary sewer collection system through structural defects, such as faulty joints between pipes or service connections, defects in manhole walls, or defects in pipes.  Inflow results from stormwater runoff that enters a sanitary sewer collection system though roof leaders, cleanouts, foundation drains, sump pumps, cellar drains, yard drains, defective manhole covers, and old connections between the sanitary and storm sewers. Inflow can also occur in dry weather from sump pumps or foundation drains that receive groundwater under dry conditions.  Excess flows due to I/I can hydraulically overload sewers, pumping stations and wastewater treatment plants, resulting in discharges of untreated sewage, including sanitary sewer overflows (SSOs).

76.    Raw municipal sewage discharges contain all of the pollutants commonly found in raw wastewater entering a municipal wastewater treatment plant.  These pollutants include:

microbial pathogens, oxygen depleting substances, total suspended solids (TSS), heavy metals, toxic organic compounds, and nutrients.

77.    Fecal coliforms are used as an indicator of possible sewage contamination, including the presence of pathogenic microorganisms.  Common pathogenic microorganisms found in raw municipal sewage discharges include bacteria, viruses, and parasites.  Pathogenic microorganisms found in raw municipal sewage discharges can cause disease in aquatic biota and illness or death in humans.

78.    Pathogenic bacteria commonly found in raw municipal sewage discharges include: Campylobacter, which causes food poisoning (E. coli is a common species of Campylobacter); Salmonella, which causes typhoid fever and other enteric diseases; Shigella, which causes food poisoning; and Vibrio cholera, which causes cholera.  Spore forming bacteria can survive for long times under conditions in receiving waters or storm sewers.  Over 120 intestinal viruses may be found in untreated sewage discharges including: poliovirus, infectious hepatitis virus, and Coxsackie virus.

79.    Common pathogenic protozoa contained in raw municipal sewage discharges in the United States are Giardia and Cryptosporidium.  Giardia and Cryptosporidium cause diarrhea. Giardia is one of the most frequent causes of waterborne diseases in the United States (both through water supply and through recreational water contact).  Both of these protozoans are capable of forming cysts or oocysts, which allow for long survival times in receiving waters and conditions in storm drains.

80.    Raw municipal sewage discharges contain heavy metals, including cadmium, copper, lead, mercury, and zinc, which are toxic to aquatic organisms as well as humans.  Raw municipal sewage discharges also contain total suspended solids ("TSS"), both organic and inorganic.  TSS can impair fish, impair reproduction and larvae, and adversely impact habitat

through sedimentation.  Toxic heavy metals as well as organic toxins found in municipal sewage are commonly attached to TSS.

81.    Raw municipal sewage discharges also contain oxygen demanding substances and nutrients ("CBOD$_5$" or "BOD$_5$").  Oxygen demanding substances impact the dissolved oxygen in receiving waters that is necessary for aquatic life.  Nutrients, primarily nitrogen and phosphorous, contribute to eutrophication in receiving waters leading to algae blooms.

82.    Raw municipal sewage discharges also contain endocrine disrupting chemicals ("EDCs"), such as pharmaceuticals and personal care products.  EDCs are chemicals that are capable of interfering with the function of the endocrine systems of humans and wildlife by either stimulating or representing endocrine system function.

83.    Discharges of untreated sewage can result in the closing of recreational and beach areas, prevention of fishing or shellfish harvesting, and public health risks associated with the presence of raw or partially treated municipal sewage in public roadways, drainage ditches, basements, or surface waters.

84.    The waters in Long Island Sound in and near Westchester County, including New Rochelle Harbor, are generally designated Class SA saline surface waters: "The best usages of Class SA waters are shellfishing for market purposes, primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 NYCRR §701.10.  However, because of pollution, including the violations alleged in this Second Amended Complaint, these waters are not suited for such uses, due to the presence of pollutants including oxygen demand, excess nitrogen, and floatable debris.  These waters have been listed as "impaired" on New York State's 2014 Impaired Waters List.

85.     The waters in Westchester County's Larchmont, Mamaroneck, and Port Chester harbors are Class SB saline surface waters: "The best usages of Class SB waters are primary and secondary contact recreation and fishing. These waters shall be suitable for fish, shellfish, and wildlife propagation and survival." 6 NYCRR § 701.11.  However, because of pollution, including the violations alleged in this Second Amended Complaint, these waters are consistently not suited for such uses, due to the presence of pollutants including pathogens and floatable debris.  These waters have been listed as "impaired" on New York State's 2014 Impaired Waters List.

**B.      Westchester County's sanitary sewer infrastructure.**

86.     Westchester County owns and operates four wastewater treatment plants that discharge to the Long Island Sound.  Each of the four plants is located at the end of one of four sanitary sewer districts: the Blind Brook Sanitary Sewer District, the Mamaroneck Sanitary Sewer District, the New Rochelle Sanitary Sewer District, and the Port Chester Sanitary Sewer District. Wastewater from each sanitary sewer district flows through collector sewers owned and operated by the Municipality Defendants.  The collector sewers then discharge to trunk sewers and wastewater treatment plants ("WWTPs") owned and operated by the County.  Together, the collector sewers, trunk sewers, and WWTPs that make up each sanitary sewer district comprise a single, publicly owned treatment works ("POTW").

87.     The Blind Brook Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound pursuant to SPDES Permit No. NY0026719.  The permit issued to Westchester County authorizes and regulates discharges from the treatment plant, located at 141 Oakland Beach Avenue, Rye, NY and, in exceptional circumstances, from certain emergency bypasses.  The Blind Brook treatment plant collects and treats wastewater from (and forms part of) a publicly owned treatment works called the Blind Brook Sanitary Sewer District, which is owned and operated by the County and four

municipalities: the City of Rye, the Town/Village of Harrison, the Village of Mamaroneck, and the Village of Rye Brook.

88.    The Port Chester Sanitary Sewer District Wastewater Treatment Plant discharges into Long Island Sound pursuant to SPDES Permit No. NY0026786.  The permit issued to Westchester County authorizes and regulates discharges from the treatment plant, located at Fox Island Road, Port Chester, NY.  The Port Chester treatment plant collects and treats wastewater from (and forms part of) a publicly owned treatment works called the Port Chester Sanitary Sewer District, which is owned and operated by the County and three municipalities: the Village of Mamaroneck, the Village of Port Chester, and the Village of Rye Brook.

89.    The Mamaroneck Sanitary Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound pursuant to SPDES Permit No. NY0026701.  The permit issued to Westchester County authorizes and regulates discharges from the treatment plant, located at West Boston Post Road, Mamaroneck, NY and, in exceptional circumstances, from certain emergency bypasses.  The Mamaroneck treatment plant collects and treats wastewater from (and forms part of) a publicly owned treatment works called the Mamaroneck Sanitary Sewer District, which is owned and operated by, the County and seven municipalities: the City of New Rochelle, the City of Rye, the City of White Plains, the Town/Village of Harrison, the Town of Mamaroneck, the Village of Mamaroneck, and the Village of Scarsdale.

90.    The New Rochelle Sewer District Wastewater Treatment Plant discharges into Long Island Sound or waters flowing into Long Island Sound pursuant to SPDES Permit No. NY0026697.  The permit issued to Westchester County authorizes and regulates discharges from the treatment plant, located at 1 LeFevres Lane, New Rochelle, NY, from two sanitary sewage

overflow (SSO) control facilities, and, in exceptional circumstances, from certain emergency bypasses. The New Rochelle treatment plant collects and treats wastewater from (and forms part of) a publicly owned treatment works called the New Rochelle Sanitary Sewer District, which is owned and operated by the County and four municipalities: the City of New Rochelle, the Town of Mamaroneck, the Village of Larchmont, and the Village of Pelham Manor.

91.     The two sanitary sewage overflow control facilities (also termed "Overflow Retention Facilities," or "ORFs") in the New Rochelle Sewer District are: the Flint Ave. & Cherry Ave. – SSO Control Facility (Outfall No. 003), located in the Village of Larchmont, and the Whitewood Ave. – SSO Control Facility (Outfall No. 005), located in the City of New Rochelle.

92.     The SPDES Permit for the New Rochelle Sewer District required that Westchester County either eliminate discharges from the overflow retention facilities by August 1, 2014 or ensure that any future discharges comply with the effluent limitations under the Clean Water Act's "secondary treatment standards" under 40 CFR § 133.100 *et seq.*, which is the standard that the New Rochelle treatment plant itself was designed to meet.

93.     Upon information and belief, the sanitary sewage overflow retention facilities in the New Rochelle Sewer District do not provide secondary treatment to wastewater before discharging into Long Island Sound, and the County and the four municipalities have failed to take sufficient steps to eliminate all discharges or to achieve the required levels of water quality for such discharges.

**C.     Discharges from the New Rochelle Sewer District's overflow retention facilities.**

94.     According to the County's Discharge Monitoring Reports, from 2008 through 2015 the Flint Ave. & Cherry Ave. – SSO Control Facility (Outfall No. 003) discharged 25 times into Long Island Sound, as shown in Table 1 below.  After August 1, 2014—when the County was required to eliminate all discharges from this sanitary sewage overflow control facility or comply

with stated pollutant limitations—on December 9–10, 2014, nearly one million gallons of partially treated sewage that did not meet secondary treatment standards were discharged from Outfall 003 into Long Island Sound. Moreover, the frequency and regularity of overflow discharges from this facility in the period prior to August 2014, especially during periods of heavy rainfall, illustrate that future and continuing discharges not authorized by, and in violation of, the SPDES permit are not only reasonably likely, but practically inevitable.

**Table 1 − Flint Ave. & Cherry Ave. − SSO Control Facility (Outfall No. 3):**
**Discharges 2008–2015 − NYSDEC SPDES Permit No. NY-0026697**

| Month & Dates | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD$_5$ (mg/l) | Chlorine, Total Residual (mg/l) |
|---|---|---|---|---|---|---|---|
| Feb 2008 | 0.46 | 24,000 | 22 | 0.1 | 14 | 47 | 0.8 |
| Sept 2008 | 0.25 | 24,000 | 47.8 | 0.1 | 15.7 | 52.6 | 1.7 |
| Dec 2008 | 1.12 | 24,000 | 17.9 | 0.1 | 8.9 | 38.1 | 1.1 |
| June 2009 | 1.40 | 41 | 17.2 | 0.1 | 10.2 | 43.5 | 1.2 |
| Feb 2010 2/26/2010 | 0.56 | 40 | 9.9 | 0.0 | 5.5 | 25.6 | 1.4 |
| Mar 2010 3/14/2010 3/29/2010 | 1.82 3.58 | 126 24,000 | 24 24 | 0.0 0.0 | 10 11 | 39 26 | 1.8 1.4 |
| Mar 2011 3/7/2011 3/11/2011 | 0.74 0.56 | 56,126 357,771 | 16.8 15.7 | 0.0 0.0 | 6.8 6.9 | 22.7 15.2 | 1.0 0.7 |
| May 2011 5/19/20115 | 0.67 | 266,533 | 34 | 0.0 | 874.3 | 36.4 | 1.0 |
| Aug 2011 8/14/2011 8/28/2011 | 1.02 1.97 | 5,518,261 1,139,825 | 44 unreported | 0.0 0.0 | 14.2 5.0 | 29.8 11.5 | 1.0 1.3 |

| Month & Dates | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD$_5$ (mg/l) | Chlorine, Total Residual (mg/l) |
|---|---|---|---|---|---|---|---|
| Sep 2011 9/6/2011 9/9/11 | 4.56 | 819,756 | 15.3 | 0.0 | 8.2 | 2.0 | 1.0 |
| Sep 2012 9/28/2012 | 0.19 | 255,875 | 34 | 0.0 | 10.3 | 48.3 | 0.9 |
| June 2013 6/8/2013 6/11/2013 | 1.09 0.47 | 1,226 240,000 | 32 17.3 | 0.0 0.0 | 6.7 10.8 | 58.5 24 | 1.9 0.9 |
| Mar 2014 3/30 & 3/31 | 0.64 | 136,059 | 20.3 | 0.0 | 5 | 18 | 1.4 |
| April 2014 4/30 & 5/1 | 1.58 | 44,398 | 19.7 | 0.0 | 9.1 | 35.2 | 1.3 |
| Dec 2014 12/9 & 12/10 | 0.92 | 107,331 | 375 | 0.0 | 7.6 | 81.9 | 1.5 |

95.     More recent Discharge Monitoring Reports confirm that the Flint Ave. & Cherry Ave. – SSO Control Facility (Outfall No. 003) continues to discharge partially treated sewage that does not meet secondary treatment standards.  On March 2, 2018, and again on December 14, 2019, the facility discharged more than 400,000 gallons of sewage into Long Island Sound.

96.     According to the County's Discharge Monitoring Reports, from 2008 through 2015 the Whitewood Ave. – SSO Control Facility (Outfall No. 005) discharged 14 times into Long Island Sound, as shown in Table 2 below.  While no discharges have been reported from Outfall 005 after August 1, 2014, the frequency and regularity of discharges in the period prior to that date illustrate that future and continuing discharges not authorized by, and in violation of, the SPDES permit are not only reasonably likely, but practically inevitable.

**Table 2 − Whitewood Ave − SSO Control Facility (Fort Slocum) (Outfall No. 5):**

**Discharges 2008−2015 − NYSDEC SPDES Permit No. NY-0026697**

| Date | Flow (MG) | Coliform (No./100ml) | Solids, Suspended (mg/l) | Solids, Settleable (ml/l) | Oil and Grease (mg/l) | BOD5 (mg/l) | Chlorine, Total Residual (mg/l) |
|---|---|---|---|---|---|---|---|
| Sep 2008 | unreported | 41 | 59.1 | 0.3 | 0.3 | 38.6 | 1.3 |
| June 2009 | unreported | 240,000 | 42 | 0.1 | 18.6 | 50.2 | 1.1 |
| Mar 2010 3/14/2010 3/30/2010 | 1.20 1.94 | 24,000 24,000 | 18.7 34 | 0.0 0.0 | 5 33.6 | 16.4 45.8 | 0.6 0.7 |
| Mar 2011 3/11/2011 | 0.95 | 2,000 | 14.6 | 0.0 | 8.4 | 24.4 | 1.9 |
| Aug 2011 8/14/2011 8/28/2011 | 0.78 1.01 | 2.517,141 1,975 | 30.7 32 | 0.0 0.0 | 12 7.1 | 43.8 2.0 | 0.8 1.6 |
| Sep 2011 9/6/2011 9/8/2011 | 0.96 1.51 | 899,111 4,965 | 19.5 10.0 | 0.0 0.0 | 7.2 5.0 | 22.3 13.9 | 0.6 1.1 |
| Sep 2012 09/28/2012 | 0.19 | 413,221 | 28.6 | 0.0 | 9.7 | 29.2 | 0.6 |
| June 2013 6/7 & 6/8 | 1.02 | 980 | 16.4 | 0.0 | 7.2 | 20 | 1.3 |
| April 2014 4/30 & 5/1 | 1.9 | 267,851 | 47 | 0.0 | 7.9 | 34.2 | 1.1 |

97.    The City of New Rochelle, the Town of Mamaroneck, the Village of Larchmont, and the Village of Pelham Manor caused or contributed to the discharges from the New Rochelle Sewer District overflow retention facilities by introducing excessive flow in the system from inflow and infiltration, exceeding the capacity of the wastewater treatment plant.  As a result,

insufficiently treated sanitary wastewater has been discharged into Long Island Sound, and future discharges are inevitable.

98.    Upon information and belief, Westchester County and the four municipalities have not taken sufficient steps either to close these sanitary sewage overflow retention facilities to prevent future discharges, or to upgrade their treatment capabilities to ensure that they will meet mandated effluent discharge limitations.

**D.    Westchester County's history of Consent Orders.**

99.    For more than 20 years, the County has been subject to various Consent Orders with New York State ostensibly to ensure the County's compliance with the SPDES permits and the Clean Water Act, including taking steps to address excess inflow and infiltration into the County's sanitary sewer system.  However, these Consent Orders, and the County's acts under them, have not come close to resolving the issue, and the County is in violation of the terms of the 2008 Consent Order.  The following is a summary of the lengthy history of these Consent Orders.

100.    The Order on Consent, Case No. 3-2146/009, dated April 23, 1992 ("1992 Consent Order"), required the County to undertake inflow and infiltration evaluations and corrective actions to reduce inflow and infiltration in private, municipal and county sewer systems in the Blind Brook, Mamaroneck, and New Rochelle Sewer Districts.  The 1992 Consent Order provided that in the event that a local municipality failed to comply with the standards for reducing inflow and infiltration, the County should undertake all administrative and judicial proceedings necessary to compel the municipality to comply with such standards.  See 1992 Consent Order, Schedule of Compliance, pp. 12–14.

101.    Subsequently, the Order on Consent Case R3-3017/9808, dated August 17, 1998 ("1998 Consent Order"), specifically noted that the County had failed to take enforcement action against the municipalities to require the municipalities to remove inflow and infiltration in

accordance with the legal standards.  The Order directed the County to "issue a Notice of Violation and Hearing, setting a hearing date in January of 1999 to each of the . . . municipalities no later than October 31, 1998, in accordance with Section 824.74-824.79 of the County Sewer Act.  The [County] shall also issue a proposed Consent Order to each such municipality at that time (i.e., no later than October 31, 1998), and shall inform each municipality that it may avoid the administrative enforcement process by stipulating to such Consent Order."  In the event that any municipality failed to stipulate to such order or entered into the order and subsequently failed to comply with such order, the County was required to diligently commence enforcement proceedings.  See 1998 Consent Order, pp. 9–10.

102.    In 2004, the State and the County executed a Consent Order in Case No. CO 3-20040603-130 ("2004 Consent Order") imposing a nitrogen control requirement and requiring treatment upgrades at the Mamaroneck and New Rochelle wastewater treatment plants and an "Inflow/infiltration investigation at the New Rochelle Sanitary Sewer District."

103.    In 2008, Case No. CO 3-20080730-65 ("2008 Consent Order"), New York State again sought to address inflow and infiltration, by ordering Westchester County to "develop flow reduction strategy" by October 1, 2013.  Westchester County undertook a Flow Monitoring Program and reported the following: "The main objective of this flow monitoring program was to determine which, if any, municipalities exceed the 150 gallons per capita per day [gpcd] flow rate limit. . . .  The monitoring program lasted for 730 consecutive days. All municipalities exceeded the 150 gpcd, ranging from a low of 12% of the days during the monitoring program to a high of 61% of the days during the monitoring program."  See Table 3.

**Table 3 – Westchester Long Island Sound Municipalities, Flow Monitoring**

| Municipalities | Days with Excessive I&I (above 150 GPCD) | Peak flow (GPCD) |
| --- | --- | --- |
| Harrison | 12% | 450 |
| Rye | 13% | 650 |
| White Plains | 14.7% | 600 |
| Mamaroneck (Town) | 27.8% | 900 |
| Rye Brook | 30.3% | 850 |
| Port Chester | 46% | 350 |
| New Rochelle | 49.7% | 900 |
| Pelham Manor | 56.2% | 900 |
| Larchmont | 59% | 600 |
| Scarsdale | 59.3% | 900 |
| Mamaroneck (Village) | 61.4% | 900 |

104.    As required by the 2008 Consent Order, the County developed a flow reduction strategy and submitted it to the NYSDEC.  The State approved the flow reduction strategy submitted by the County in a letter dated June 25, 2013.

105.    The 2008 Consent Order provided that: "[i]f DEC approves the submission in whole, the submission shall be incorporated into this Order and Respondent shall implement it, in accordance with its schedules and term, as approved."  *See* 2008 Consent Order, § V.C, p.14. Accordingly, the flow reduction strategy became a condition of the 2008 Consent Order, and the County was required to implement it.

106.    The schedule for implementation of the Flow Reduction Strategy Plan in the Sewer Districts required the County to undertake several actions to reduce inflow and infiltration from municipalities, including the following: (1) complete negotiations with the municipalities by

32

July 1, 2014; (2) ensure that municipalities submit sanitary sewer evaluation programs by April 1, 2015, and evlautate those programs by August 31, 2015; (3) ensure that the municipalities implement the sanitary sewer evaluation programs from September 1, 2015 through 2017; and (4) ensure that, based on the results of the evaluations, the municipalities complete a first phase of construction projects to repair their sewers by the end of 2020.

107.    The County failed to meet any of these deadlines.

**E.    Discharges of pollution from sanitary sewer overflows.**

108.    As noted above, inflow and infiltration are a significant cause of SSOs, particularly those occurring in wet weather.  The EPA has explained that inflow and infiltration use up capacity in the sewer system and greatly increase the system's overall loading, directly leading to sewage backups and overflows.  When inflow and infiltration cause sanitary sewer overflows that reach waters of the United States, those overflows constitute unpermitted discharges from the overflowing POTW in violation of Section 301 of the Clean Water Act. When such violations occur, every POTW operator that contributed to the excess inflow and infiltration that caused the violation is liable for the violation.

109.    Between May 3, 2010 and August 3, 2015, there were at least 81 SSOs in the sanitary sewer districts at issue in this case, and at least 45 of those SSOs resulted in discharges that reached waters of the United States.  *See* Appendix B.  Many of these discharges occurred in wet weather conditions, which are subject to heightened flows due to inflow and infiltration of stormwater into the sanitary sewer systems.

110.    Between November 5, 2016 and June 30, 2020, there were at least 57 SSOs that resulted in discharges to waters of the United States.  *See* Appendix C.  Many of these discharges occurred in wet weather conditions, which are subject to heightened flows due to inflow and infiltration of stormwater into the sanitary sewer systems.

33

111.    SSOs are a recurrent problem and demonstrate that systemic violations of the Clean Water Act are occurring and will continue to occur—namely, unpermitted discharges from all four Sanitary Sewer Districts—in violation of Section 301 of the Clean Water Act.  The County and the Municipality Defendants in whose systems these SSOs occurred are in continuing violation of the Clean Water Act because the underlying causes of these SSOs—inadequate maintenance combined with excessive inflow and infiltration—are unaddressed and will cause more SSOs throughout the four POTWs.  All of the Municipality Defendants, as a result of excessive flow due at least in part to inflow and infiltration, caused or contributed to the SSOs that occurred in County-owned sewers.

## F.    Discharges of pollutants from MS4s.

112.    MS4s are conveyance systems, which include roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, and storm drains, that are owned and operated by a municipality, district, association, or other public body having jurisdiction of the disposal of sewage, industrial wastes, stormwater, or other wastes.  The conveyance system in an MS4 is designed and used to collect or convey stormwater that is not part of a combined sewer system or a publicly owned treatment works.

113.    There are 11 MS4s whose stormwater sewersheds overlap the sewersheds of the four POTWs.   The MS4s are operated by the Municipality Defendants and are co-terminus with their boundaries.   The following table identifies the "MS4 Operators" and their permit numbers.

| Name of MS4 Operator | SPDES Number |
|---|---|
| Town/Village of Harrison | NYR20A433 |
| Village of Larchmont | NYR20A178 |
| Town of Mamaroneck | NYR20A215 |
| Village of Mamaroneck | NYR20A233 |
| City of New Rochelle | NYR20A207 |

| Name of MS4 Operator | SPDES Number |
|---|---|
| Village of Pelham Manor | NYR20A179 |
| Village of Port Chester | NYR20A309 |
| City of Rye | NYR20A381 |
| Village of Rye Brook | NYR20A308 |
| Village Scarsdale | NYR20A307 |
| City of White Plains | NYR20A230 |

114. Discharges of pollution from an MS4, like any other discharges of pollution, require a SPDES permit. Section 402(p)(3)(B)(ii) of the Clean Water Act requires that SPDES permits for discharges from an MS4 shall include a requirement to effectively prohibit non-storm water discharges into storm sewers. Discharges from the MS4s in Westchester County are regulated under New York's SPDES General Permit for Stormwater Discharges from Municipal Separate Storm Sewer Systems (MS4), GP-0-15-003 (May 1, 2015). That permit explicitly defines sanitary sewage as a non-permitted illicit discharge. Thus, discharges of sewage from an MS4 violate the terms of the permit.

115. At least 8 of the 81 SSOs reported during the period between May 3, 2010 and August 3, 2015 discharged pollutants into the MS4 where the SSO occurred, reached a storm drain, and subsequently discharged from the MS4 into waters of the United States. These SSOs discharged from MS4s in the City of Rye, Village of Scarsdale, Village of Mamaroneck, Town/Village of Harrison, and the City of White Plains.

116. In addition, most if not all of the wet weather SSOs identified as having reached waters of the United States in Appendix B discharged into a portion of the MS4 system owned and operated by the municipality indicated and subsequently discharged into waters of the United States.

117. These discharges constitute illicit discharges of pollution in violation of the MS4's

SPDES permit and in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

118.    These illicit discharges are indicative of recurrent and systemic violations of the Clean Water Act.  SSO events occurring in the Municipality Defendants' sewer systems and also in the County-owned trunk sewers result in discharges to waters of the United States via MS4s. At least six of the Municipality Defendants (and perhaps others currently unknown to Plaintiffs), in their capacities as MS4 Operators, are in continuing violation of the Clean Water Act because the underlying causes of these and many other illicit discharges are unaddressed and will continue to recur throughout the MS4s.  The underlying causes of these violations are SSOs from nearby sanitary sewers, which are owned and mismanaged by the same Municipalities (and the County) in their capacities as POTW operators.

**G.    Violations of SPDES permit effluent limitations.**

119.    As noted above, each of the SPDES permits contains limitations on the amount of certain pollutants that may be contained in the effluent discharged after treatment by the wastewater treatment plant.  Such limitations include flow (the amount of water flowing through the plant), pH (the measure of acidity of the water), biological oxygen demand ($CBOD_5$), settleable solids, suspended solids, metals, etc.  The SPDES permits require the named permittee to periodically sample the effluent discharged from the POTW and to report the results of their analysis, including any instances in which the effluent exceeds the limitations contained in the permit, in a report called a Discharge Monitoring Report ("DMR").

120.    Based upon the DMR and other data between June 2013 and March 2015, the Port Chester wastewater treatment plant exceeded its SPDES permit effluent limits on nine occasions for a total of about 104 days, as shown in Table 4 below.

**Table 4 - SPDES Permit Effluent Limit Exceedances at the Port Chester WWTP**

| Date | Parameter | Effluent Limit | Effluent Limit Type | Reported Value |
|------|-----------|----------------|---------------------|----------------|
| June 2013 | pH | 6.0-9.0 | Range | 9.9 |
| June 2013 | Flow | 6.0 MGD | 30 Day Average | 6.2 MGD |
| January 7, 2014 | Fecal Coliform | 800 No/100ml | 6 hour Geometric Mean | 5,200 No/100ml |
| January 7, 2014 | Fecal Coliform | 2,400 No/100ml | Individual Sample | 5,200 No/100ml |
| February 2014 | $CBOD_5$ | 40 mg/l | 7 Day Average | 43 mg/l |
| June 16, 2014 | Fecal Coliform | 800 No/100ml | 6 hour Geometric Mean | 16,400 No/100ml |
| June 16, 2014 | Fecal Coliform | 2,400 No/100ml | Individual Sample | 16,400 No/100ml |
| March 2015 | $CBOD_5$ | 25 mg/l | 30 Day Average | 26 mg/l |
| March 2015 | $CBOD_5$ | 85% | Minimum Removal | 83% |

121.    Each of these instances constitutes a violation of the SPDES permit.

122.    The Port Chester wastewater treatment plant will exceed its effluent limits in the future, including the limits for flow and $CBOD_5$, and inflow and infiltration will be a significant contributing factor to those exceedances of effluent limitations.  These allegations are based on the following:

- The Port Chester wastewater treatment plant exceeded its SPDES Permit effluent limit for flow in June 2013.

37

- The Port Chester wastewater treatment plant nearly exceeded its SPDES Permit effluent limit for flow in March 2015, a month when there was only 4.1 inches of precipitation (normal precipitation in March is 4.5 inches).

- The plant operator reported to DEC that several large rain events were a contributing factor to the June 2013 exceedance of flow limits, and that reducing I/I would reduce future exceedances.

- The County and NYSDEC have acknowledged that I/I is a problem in the Port Chester Sanitary Sewer District.

- The Port Chester wastewater treatment plant exceeded effluent limits for $CBOD_5$ when 30 day average flows were below the design flow.

- The 30-day average flow in March 2015, when $CBOD_5$ limits were last exceeded, was 5.9 MGD, which exceeded typical plant flows by approximately 37%.

- The plant operator reported to DEC that high flows resulting from snow melt and rain during the month of March 2015 caused exceedances of $CBOD_5$ limits that month.

- Upgrades to the Port Chester wastewater treatment plant since its SPDES permit effluent limit exceedances occurred have not been fully implemented and completed.

123.    Based on DMR data for the time period between January 2012 and May 2015, and daily operational data from January 1, 2010 to June 30, 2015, the Blind Brook wastewater treatment plant exceeded its SPDES permit effluent limits on fifteen occasions for a total of 50 days during this time period, as shown in Table 5 below.

**Table 5 - SPDES Permit Effluent Limit Exceedances at the Blind Brook WWTP**

| Date | Parameter | Effluent Limit | Effluent Limit Type | Reported Value |
|---|---|---|---|---|
| September 28, 2010 | Fecal Coliform | 800 No./100ml | 6 hour Geometric Mean | 14,400 No./100ml |
| September 28, 2010 | Fecal Coliform | 2400 No./100ml | Individual Sample | 14,400 No./100ml |
| January 19, 2011 | Fecal Coliform | 800 No./100ml | 6 hour Geometric Mean | 1,200 No./100ml |
| February 28, 2011 | Fecal Coliform | 800 No./100ml | 6 hour Geometric Mean | 98,400 No./100ml |
| February 28, 2011 | Fecal Coliform | 2400 No./100ml | Individual Sample | 98,400 No./100ml |
| March 7, 2011 | Fecal Coliform | 800 No./100ml | 6 hour Geometric Mean | 80,800 No./100ml |
| March 7, 2011 | Fecal Coliform | 2400 No./100ml | Individual Sample | 80,800 No./100ml |
| April 23, 2012 | Fecal Coliform | 800 No./100ml | 6 hour Geometric Mean | 2,545 No./100ml |
| April 23 2012 | Fecal Coliform | 2400 No./100ml | Individual Sample | 2,545 No./100ml |
| October 30, 2012 | Settleable Solids | 0.3 ml/l | Daily Maximum | 4.5 ml/l |
| June 2013 | Flow | 5.0 MGD | Monthly Average | 5.1 MGD |
| March 31,2014 | BOD$_5$ | 50 mg/L | 6-Consecutive Hour Sample | 53.3 |
| March 30 - April 5, 2014 | CBOD$_5$ | 1,700 lb/day | 7 Day Average | 2,227 lb/day |
| December 6, 2014 | Settleable Solids | 0.3 ml/l | Daily Maximum | 0.9 ml/l |
| December 9, 2014 | TSS | 50 mg/L | 6-Consecutive Hour Sample | 72.0 |

124.    Each of these instances constitutes a violation of the SPDES permit.

125.    Conditions will occur where the Blind Brook wastewater treatment plant will

39

exceed its SPDES permit effluent limits in the future. These allegations are based on the following:

- The County and NYSDEC have acknowledged that I/I is a problem in the Blind Brook Sanitary Sewer District.

- The Blind Brook wastewater treatment plant exceeded its SPDES Permit effluent limit for flow in June 2013.

- The Blind Brook wastewater treatment plant nearly exceeded its SPDES permit effluent limit with a monthly average flow of 4.8 MGD in March 2015, a month when there was only 4.1 inches of precipitation (normal precipitation in March is 4.5 inches).

- The plant operator reported to DEC that several large rain events were a contributing factor to the June 2013 exceedance of flow limits, and that reducing I/I would reduce future exceedances.

- After the Blind Brook WWTP exceeded its SPDES Permit effluent limit for settleable solids on October 30, 2012 and December 6, 2014, the plant operator reported to DEC that increased I/I in October 2012 and heavy rain and high flow in December 2014 were the causes of these exceedances.

- After the Blind Brook WWTP exceeded its SPDES Permit effluent limits related to biological oxygen demand ($CBOD_5$ and $BOD_5$) in March and April 2014, the plant operator reported to DEC that heavy rain and high flows were a contributing factor to these permit violations and that reducing I/I would reduce future exceedances.

40

- All of the above noted fecal coliform exceedances occurred in wet
  weather conditions.

126.    Accordingly, the Blind Brook wastewater treatment plant will exceed its effluent limitations in the future, and inflow and infiltration will be a significant contributing factor resulting in exceedances of effluent limitations.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Unlawful Discharge of Pollutants from New Rochelle
Sewer District Overflow Retention Facilities**

127.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

128.    This claim is asserted against the County, the City of New Rochelle, the Town of Mamaroneck, the Village of Larchmont, and the Village of Pelham Manor.

129.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the Clean Water Act.  Among other things, Section 301(a) prohibits discharges not authorized by a valid permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

130.    Section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

131.    Section 502(6) of the Clean Water Act, 33 U.S.C. § 1362(6), defines "pollutant" to include, among other things, chemical wastes, biological materials, rock, sand, and industrial waste discharged into water.

132.    Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

133.    Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."  Long Island Sound, and the rivers, streams, bays, and other waters that flow into it, are navigable waters of the United States.

134.    The Flint Ave. & Cherry Ave. – SSO Control Facility (SPDES Permit Number NY0026697, Outfall No. 3) located in the Village of Larchmont, which is part of the New Rochelle Sewer District, is a "point source" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), and discharges into Long Island Sound.

135.    The Whitewood Ave. – SSO Control Facility (Fort Slocum) (SPDES Permit Number NY0026697, Outfall No. 5) located in the City of New Rochelle, which is part of the New Rochelle Sewer District, is a "point source" within the meaning of section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14), and discharges into Long Island Sound.

136.    Discharges of partially treated sewage from the overflow retention facilities in the New Rochelle Sanitary Sewer District contain pollutants within the meaning of Section 502(6) of the Clean Water Act, including, but not limited to, fecal coliform, settleable solids, suspended solids, biological oxygen demand, oil and grease, residual chlorine, and nitrogen.

137.    The discharge of these pollutants affects the health and abundance of fish and shellfish by retarding growth and reducing available food sources.  These pollutants also cause physical and chemical degradation to water quality which can adversely affect the aesthetic quality

and dissolved oxygen levels of affected waters.  Conditions of low dissolved oxygen (called "hypoxia") or no dissolved oxygen (called "anoxia") threaten the abundance of healthy fish and shellfish in affected waters.

138.    Discharges from the Flint Ave. & Cherry Ave. – SSO Control Facility and the Whitewood Ave. – SSO Control Facility are regulated under the terms of SPDES Permit NY0026697.

139.    The Permit prohibits all discharges of pollution from these sanitary sewage overflow control facilities after August 1, 2014, unless those discharges meet the Clean Water Act's secondary treatment standards.

140.    On December 9–10, 2014, nearly one million gallons of polluted water were discharged into Long Island Sound from the Flint Ave. & Cherry Ave. – SSO Control Facility.

141.    On information and belief, that discharge did not meet secondary treatment standards.

142.    The City of New Rochelle, the Town of Mamaroneck, the Village of Larchmont, and the Village of Pelham Manor caused or contributed to that discharge, which resulted from excessive flow due to inflow and infiltration into the sanitary sewer system.

143.    The County and these municipalities have violated Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, by illegally discharging nearly one million gallons of pollution—including but not limited to fecal coliform, settleable solids, suspended solids, biological oxygen demand, and nitrogen—into Long Island Sound from its Flint Ave. & Cherry Ave. – SSO Control Facility located in the Village of Larchmont, which is part of the New Rochelle Sewer District, on December 9–10, 2014.

144.    The County and these municipalities have again violated Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. § 1311(a), 1342, by illegally discharging over 400,000 gallons

of pollution—including but not limited to fecal coliform, settleable solids, suspended solids, biological oxygen demand, and nitrogen—into Long Island Sound from its Flint Ave. & Cherry Ave. – SSO Control Facility located in the Village of Larchmont, which is part of the New Rochelle Sewer District, on March 2, 2018 and again on December 14, 2019.

145.    Each and every day on which pollution was discharged from the Flint Ave. & Cherry Ave. – SSO Control Facility (SPDES NY0026697, Outfall No. 003) without authorization under the SPDES permit is a separate and distinct violation of Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342.

146.    These violations of the Clean Water Act are ongoing, continuous, or intermittent, and there is more than a reasonable likelihood of recurrence of these violations.  From 2008 through 2015, wastewater was discharged that did not meet secondary treatment standards 15 times from the Flint Ave. & Cherry Ave. – SSO Control Facility and 14 times from the Whitewood Ave. – SSO Control Facility in the New Rochelle Sewer District.  Since 2015, the Flint Ave. & Cherry Ave. – SSO Facility has discharged wastewater that does not meet secondary treatment standards at least two additional times.  Insufficient steps have been taken to close these facilities or to upgrade their treatment capabilities to ensure compliance with its permit conditions.  Barring such action, continuing unpermitted discharges from these facilities and/or discharges in violation of the SPDES permit are inevitable.

147.    Without the issuance of an injunction and the imposition of appropriate civil penalties, the County and Municipality Defendants named herein will continue to violate the Clean Water Act and the SPDES permits for the Sanitary Sewer Districts to further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

148.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

149.    Wherefore, Plaintiffs pray for relief as set forth below.

### SECOND CAUSE OF ACTION

**Failure to Comply with SPDES Permit Conditions
Requiring Enforcement of County Sewer Act**

150.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

151.    This claim is asserted against Westchester County.

152.    The County violates the Clean Water Act by failing to comply with the SPDES permits for the four Sanitary Sewer Districts that discharge into Long Island Sound, which require it to enforce the County Sewer Act and to remove excess inflow and infiltration to the extent that is economically feasible (including through enforcement of the County Sewer Act).

153.    The SPDES permits for these Sanitary Sewer Districts all state that the County "is authorized to discharge … in accordance with: effluent limitations, monitoring and reporting requirements, other provisions and conditions set for in this permit; and 6 NYCRR Part 750-1.2(a) and 750-2."

154.    6 NYCRR § 750-2.9 is fully incorporated into the four permits and requires, *inter alia*, that the County "shall enact, maintain and enforce or cause to be enacted, maintained and enforced up-to-date and effective sewer use law in all parts of the [publicly owned treatment works] service area." See 6 NYCRR § 750-2.9 (4).

155.    The County's past and continuing failure to enforce the County Sewer Act (Westchester County Administrative Code, Chapter 824) is a violation of each of the SPDES permits.

156.     Specifically, the County has failed and continues to fail to enforce the provision, under the County Sewer Act § 824.72, that municipalities may not introduce excessive inflow and infiltration into the county trunk sewer system of more than 150 gallons per capita per day.

157.     The County's own assessment concluded that all municipalities in the Sewer Districts have extraneous flows due to inflow and infiltration exceeding the 150 gpcd limit. And the peak levels of excessive inflow and infiltration were sixfold above the legal 150 gpcd threshold in some municipalities.

158.     The County's Flow Monitoring Program Report concluded that "I/I [inflow and infiltration] in the Westchester County Sewer Districts is a significant problem, contributing up to 50% of the flow to the WWTPs [wastewater treatment plants]. It is to be expected that the aging sewer systems will continue to deteriorate and I/I will continue to increase."

159.     The County has failed to take any significant measures in over a decade that actually reduced inflow and infiltration, and has failed to enforce the County Sewer Act despite rampant and continuing violations of excessive flows by every single municipality. For over a decade, the County has not brought administrative or judicial actions to enforce the County Sewer Act's provisions that govern flows, loads, and discharges into the Sewer Districts. Upon information and belief, the County has not issued orders under the County Sewer Act, scheduled hearings, or levied fines.

160.     Upon information and belief, all municipalities in the Sewer Districts continue to have extraneous flows due to inflow and infiltration exceeding 150 gpcd on a frequent and regular basis.

161.     The County's violations of the SPDES permits are ongoing and continuous.

162.     Without the issuance of an injunction and the imposition of appropriate civil penalties, the County will continue to violate the Clean Water Act and the SPDES permits for the

Sewer Districts to further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

163.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

164.    Wherefore, Plaintiffs pray for relief as set forth below.

## THIRD CAUSE OF ACTION

**Failure to Comply with Conditions in an Order issued by the State with Respect to an Effluent Standard or Limitation**

165.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

166.    This claim is asserted against Westchester County.

167.    The citizen suit provision of the Clean Water Act, section 505(a)(1), 33 U.S.C. § 1365(a)(1), authorizes any citizen to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation'' or "an order issued by the Administrator or a State with respect to such a standard or limitation."

168.    The 2008 Consent Order is an order issued by a State with respect to effluent standards and limitations contained in the Defendant's four SPDES permits.

169.    The 2008 Consent Order required the County to develop a flow reduction strategy.

170.    Pursuant to the 2008 Consent Order, the County developed and submitted its flow reduction strategy to the State, and received the State's approval in a letter dated June 25, 2013.

171.    The 2008 Consent Order states: "[i]f DEC approves the submission in whole, the submission shall be incorporated into this Order and Respondent shall implement it, in accordance with its schedules and term, as approved."  (See 2008 Consent Order, Section V. (C), p. 14).

172.    Thus, once the flow reduction strategy and schedule were accepted by New York State, they became part of the 2008 Consent Order.

173.    The County's flow reduction strategy includes a schedule for implementation that requires the County to undertake a series of actions with deadlines from 2014 through 2027.  These actions include negotiating agreements with municipalities for evaluation of sewers and subsequent repair, supervising the evaluations, and supervising the subsequent repairs in several phases.

174.    As of the filing of this Second Amended Complaint, the County has not met any of the deadlines established in the Flow Reduction Strategy.

175.    Thus, the County is violating the 2008 Consent Order, and thus violates Section 402 of the Clean Water Act, 33 U.S.C. § 1342.

176.    The County's violations of the 2008 Consent Order are ongoing and continuous.

177.    Without the issuance of an injunction and the imposition of appropriate civil penalties, the County will continue to violate the 2008 Consent Order to the further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

178.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

179.    Wherefore, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Unauthorized Discharges of Pollution from SSOs

180.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

181.    This claim is asserted against Westchester County, the Town/Village of Harrison, the Village of Larchmont, the Town of Mamaroneck, the Village of Mamaroneck, the City of New

Rochelle, the Village of Pelham Manor, the Village of Port Chester, the City of Rye, the Village of Rye Brook, the Village of Scarsdale, and the City of White Plains.

182.    The County and Municipality Defendants named in this claim have caused or contributed to the discharge of untreated or partially treated wastewater through sanitary sewer overflows during the period between May 3, 2010 and August 3, 2015, many of which occurred in wet weather conditions.

183.    At least 45 of these sanitary sewer overflows have resulted in the addition of pollutants to the waters of the United States, including Long Island Sound and its tributaries.

184.    These discharges constitute unauthorized discharges of pollution in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

185.    The County and the Municipality Defendants named in this claim have taken insufficient affirmative steps to eliminate these violations by repairing, replacing, and upgrading their defective sanitary sewer systems.

186.    The discharges of sewage through sanitary sewer overflows are adversely affecting human health and the environment.

187.    Each day that any of the Defendants named in this claim have discharged and continued to discharge raw or inadequately treated sewage and other pollutants to waters of the United States through sanitary sewer overflows, is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

188.    These violations of the Clean Water Act are ongoing, continuous, or intermittent, and there is more than a reasonable likelihood of recurrence of these violations.  Between May 3, 2010 and August 3, 2015 there have been at least 81 sanitary sewer overflows in the sewage collection systems of the County and the Municipality Defendants, and the discharges from at least 45 of those overflows reached waters of the United States.  *See* Appendix B.  Further, from

November 5, 2015 through June 30, 2020, there have been at least 57 sanitary sewer over flows in the sewage collection systems of the County and the Municipality Defendants that reached the waters of the United States. *See* Appendix C. Because insufficient steps have been taken to address the causes of these sanitary sewer overflows, the future discharge of pollutants is inevitable.

189.    Without the issuance of an injunction and the imposition of appropriate civil penalties, the County and the Municipality Defendants named in this claim will continue to violate the Clean Water Act to the further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

190.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

191.    Wherefore, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### Unauthorized Discharges of Pollution from MS4 Systems

192.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

193.    This claim is asserted against the Town/Village of Harrison, the Town of Mamaroneck, the Village of Mamaroneck, the City of Rye, the Village of Scarsdale, and the City of White Plains.

194.    The Municipality Defendants named in this claim own and operate municipal separate storm sewer systems (MS4s) for the collection and conveyance of stormwater, separate from a sanitary sewer system or a publicly owned treatment works. These MS4 systems are regulated by the MS4 permit, which prohibits the discharge of non-stormwater into the storm sewers.

195.    Raw or inadequately treated sewage that enters the MS4 is not stormwater and is a violation of the MS4 permit.

196.    All discharges of raw or inadequately treated sewage from the MS4 system constitute the unauthorized discharge of pollutants in violation of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

197.    The Municipality Defendants named in this claim have taken insufficient affirmative steps to eliminate these violations by repairing, replacing, and upgrading their defective collection systems that are the cause of these violations.  Because insufficient steps have been taken, sewage spill discharge violations through the MS4 systems will continue in the future.

198.    Each day that any of the Municipality Defendants named in this claim have discharged and continue to discharge raw or inadequately treated sewage into the MS4 system in violation of the MS4 permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

199.    These violations of the Clean Water Act are ongoing, continuous, or intermittent, and there is more than a reasonable likelihood of recurrence of these violations.  Between May 3, 2010 and August 3, 2015 there have been dozens of discharges of sewage into the MS4 systems of the Municipality Defendants named in this claim and from the MS4 systems to the waters of the United States.  Because insufficient steps have been taken to address the causes of these discharges, the future discharge of pollutants is inevitable.

200.    Without the issuance of an injunction and the imposition of appropriate civil penalties, the Municipality Defendants named in this claim will continue to violate the Clean Water Act, to the further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

201.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

202.    Wherefore, Plaintiffs pray for relief as set forth below.

## SIXTH CAUSE OF ACTION

### Violation of SPDES Permit Effluent Limitations

203.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

204.    This claim is asserted against Westchester County, the Town/Village of Harrison, the Village of Mamaroneck, the Village of Port Chester, the City of Rye, and the Village of Rye Brook.

205.    As set forth above, Westchester County, the Village of Mamaroneck, the Village of Port Chester, and the Village of Rye Brook own and co-operate a POTW called the Port Chester Sanitary Sewer District, that holds a SPDES permit that allows the discharge of treated wastewater from the Port Chester wastewater treatment plant.  Discharge Monitoring Reports for the facility have reported violations of effluent limitations contained in the SPDES permit.

206.    As set forth above, Westchester County, the Town/Village of Harrison, the Village of Mamaroneck, the City of Rye, and the Village of Rye Brook own and co-operate a POTW called the Blind Brook Sanitary Sewer District, that holds a SPDES permit that allows the discharge of treated wastewater from the Blind Brook wastewater treatment plant.  Discharge Monitoring Reports for the facility have reported violations of the effluent limitations contained in the SPDES permit.

207.    The violations of effluent limitations contained in the SPDES permits for the Port Chester and Blind Brook wastewater treatment plants constitute violations of Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§1311(a), 1342.

208.    Each day in which violations were reported of effluent limitations at the Port Chester and Blind Brook wastewater treatment plants constitute a separate violation of the Clean Water Act and the SPDES permits regulating those facilities.

209.    The violations reported for the Port Chester and Blind Brook wastewater treatment plants are ongoing, continuous, and/or are likely to continue.  Because insufficient steps have been taken to address the causes of these exceedances, future violations of effluent limitations in the SPDES permits are inevitable.

210.    Without the issuance of an injunction and the imposition of appropriate civil penalties, the County and the Municipality Defendants named in this claim will continue to violate the Clean Water Act, to the further injury of Save the Sound, its members, Atlantic Clam, and Long Island Sound.

211.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Save the Sound, its members, and Atlantic Clam, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

212.    Wherefore, Plaintiffs pray for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### Public Nuisance

213.    Plaintiffs incorporate by reference all preceding paragraphs as if set forth herein.

214.    This claim is against Westchester County, the Town/Village of Harrison, the Village of Larchmont, the Town of Mamaroneck, the Village of Mamaroneck, The City of New Rochelle, the Village of Pelham Manor, the Village of Port Chester, the City of Rye, the Village of Rye Brook, the Village of Scarsdale, and the City of White Plains.

215.    The County and Municipality Defendants named in this claim, having caused or contributed to the discharge of untreated or partially treated wastewater as alleged above, have

created a public nuisance in that the addition of pollutants to Long Island Sound has offended, interfered with, or caused harm to the public in the exercise of common rights and in a manner such as to endanger the property, health, safety, or comfort of a considerable number of persons, including their right to waters, lands, and an environment that are free from pollution.

216.    Atlantic Clam and certain members of Save the Sound have suffered a peculiar or special harm as a result of Defendants' conduct, including, but not limited to the inability to pursue commercial activities, such as shellfishing, fishing, and the pursuit of businesses that are adversely affected by the addition of pollution to Long Island Sound.

217.    Without the issuance of an injunction, Defendants will continue to create and maintain a public nuisance, to the further injury of Atlantic Clam, certain members of Save the Sound, and Long Island Sound.

218.    Continuing commission of the acts and omissions alleged above irreparably harms the waters of Long Island Sound, Atlantic Clam, and certain members of Save the Sound, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

219.    Wherefore, Plaintiffs pray for relief as set forth below.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

(a)    Declare that the Defendants have violated and continue to be in violation of the Clean Water Act as alleged herein;

(b)    Enjoin Defendants from discharging pollutants from the Flint Ave. & Cherry Ave. – SSO Control Facility and the Whitewood Ave. – SSO Control Facility except as authorized by and in compliance with the SPDES permit;

(c)    Enjoin Defendants from further violations of the Clean Water Act;

(d)  Order Defendants to immediately comply fully with all applicable requirements of the SPDES permits and the 2008 Consent Order;

(e)  Order Defendants to take appropriate actions to restore the quality of the waters impaired by their activities;

(f)  Order Defendants to pay civil penalties of $37,500 per day per violation for all violations of the Clean Water Act occurring prior to November 2, 2015 and $55,800 for all subsequent violations, pursuant to Sections 309(d) and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365(a), and 40 C.F.R. §§ 19.1–19.4;

(g)  Award to Plaintiffs costs (including reasonable investigative, attorney, witness, and consultant fees) in accordance with Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

(h)  Enjoin Defendants from creating and maintaining a public nuisance; and,

(i)  Award such other relief as this Court deems just and proper.

## VIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated this 30th day of June, 2020.

Respectfully submitted,

/s/  *Edan Rotenberg*
Edan Rotenberg
Super Law Group, LLC
411 State Street, 2R
Brooklyn, New York 11217
212-242-2355

Of Counsel:

Roger Reynolds, Legal Director

Save the Sound
142 Temple Street
New Haven, Connecticut 06510
(203) 787-0646

*Attorneys for Plaintiffs*

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix A – Acronyms & Abbreviations**

| | |
|---|---|
| CWA | Clean Water Act |
| DMR | discharge monitoring report |
| GPCD | gallons per capita per day |
| I/I or I&I | inflow and infiltration |
| MGD | million gallons per day |
| NPDES | National Pollutant Discharge Elimination System |
| NYSDEC | New York State Department of Environmental Conservation |
| ORFs | Overflow Retention Facilities |
| POTW | publicly owned treatment works |
| SPDES | State Pollutant Discharge Elimination System |
| SSO | sanitary sewer overflow |
| TMDL | Total Maximum Daily Load |
| WCDEF | Westchester County Department of Environmental Facilities |
| WWOP | Wet Weather Operations Plans |
| WWTP | waste water treatment plant |

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix B – SSOs Reaching Waters of the United States as of November 4, 2015**

| SSO # | DATE | COLLECTION SYSTEM | RECEIVING WATER BODY |
|---|---|---|---|
| R1 | 3/9/2015 | City of Rye | Long Island Sound |
| R2 | 12/9/2014 | City of Rye | Long Island Sound |
| R3 | 11/17/2014 | City of Rye | Long Island Sound |
| R4 | 3/15/2015 | Town/Village of Harrison | Mamaroneck River |
| R5 | 5/20/2014 | Town/Village of Harrison | Mamaroneck River |
| R6 | 7/24/2013 | Town/Village of Harrison | Blind Brook |
| R8 | 5/11/2013 | Town/Village of Harrison | Mamaroneck River |
| R9 | 12/9/2014 | Westchester County | Long Island Sound |
| R10 | 3/30/2014 | Westchester County[*] | Long Island Sound |
| R11 | ND | Village of Mamaroneck | Mamaroneck Harbor |
| R12 | 12/9/2014 | Village of Mamaroneck | Mamaroneck River & Harbor |
| R13 | 5/1/2014 | Village of Mamaroneck | Mamaroneck Harbor |
| R14 | 5/1/2014 | Town of Mamaroneck | Gulon Creek |
| R15 | 5/1/2014 | Village of Mamaroneck | Sheldrake River |
| R16 | 4/30/2014 | Village of Mamaroneck | Mamaroneck Harbor |
| R18 | 6/11/2013 | Westchester County | Storm Drain[†] |
| R19 | 5/1/2014 | Village of Mamaroneck | Mamaroneck River |
| R20 | 4/30/2014 | Westchester County[*] | Long Island Sound |
| R21 | 4/30/2014 | Westchester County[*] | Long Island Sound |
| R22 | 1/6/2015 | City of Rye | Long Island Sound |
| R23 | 12/30/2014 | City of Rye | Blind Brook |
| R24 | 5/1/2014 | City of Rye | Long Island Sound |
| R25 | 3/24/2014 | City of Rye | Blind Brook |
| R26 | 1/17/2014 | City of Rye | Blind Brook |
| R29 | 7/15/2013 | City of Rye | Blind Brook |

i

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix B – SSOs Reaching Waters of the United States as of November 4, 2015**

| SSO # | DATE | COLLECTION SYSTEM | RECEIVING WATER BODY |
|-------|------|-------------------|----------------------|
| R30 | 6/11/2013 | City of Rye | Storm Drain |
| R31 | 3/19/2015 | Village of Scarsdale | Bronx River |
| R32 | 5/1/2014 | Village of Scarsdale | Storm Drain/Tributary to Bronx River |
| R33 | 5/1/2014 | Village of Scarsdale | Hutchinson River |
| R34 | 1/25/2014 | City of White Plains | Bronx River |
| R35 | 6/17/2013 | City of White Plains | Bronx River |
| S2 | 6/2/2013 | Village of Mamaroneck | Mamaroneck River |
| S3 | 5/23/2013 | Village of Mamaroneck | Storm Drain/Mamaroneck River |
| S4 | 3/12/2013 | Village of Mamaroneck | Mamaroneck River |
| S5 | 2/27/2013 | Village of Mamaroneck | Long Island Sound |
| S32 | 2/25/2011 | City of Rye | Storm Drain |
| S33 | 2/8/2011 | City of Rye | Storm Drain |
| S38 | 5/3/2010 | Village of Scarsdale | Bronx River |
| S40 | 10/22/2014 | Town/Village of Harrison | Storm Drain |
| S43 | 3/15/2014 | City of White Plains | Bronx River |
| S45 | 6/10/2010 | City of White Plains | Storm Drain |
| CEA3 | 9/7/2011 | Town/Village of Harrison | Unknown |
| CEA4 | 10/30/2012 | Town/Village of Harrison | Mamaroneck River |
| CEA5 | 6/8/2013 | Town/Village of Harrison | Mamaroneck River |
| CEA6 | 8/3/2015 | Westchester County | Hutchinson River/Twin Lakes |

---

[*] SSO was permitted discharge from the County's overflow Retention Facilities.

[†] For each entry that lists a "Storm Drain" as the Receiving Water Body, Plaintiffs do not currently know into which exact body of water those drains discharge, but believe that they consist of Long Island Sound and its tributaries.

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix C – SSOs Reaching Waters of the United States**
**November 5, 2015 through June 30, 2020**

| SSO # | DATE | COLLECTION SYSTEM | RECEIVING WATER BODY |
|---|---|---|---|
| R36 | 9/17/2017 | Village of Rye Brook | Blind Brook |
| R37 | 9/20/2017 | Village of Rye Brook | Blind Brook |
| R38 | 6/10/2017 | Blind Brook WWTP | Blind Brook Creek |
| R41 | 4/19/2016 | Town/Village of Harrison | Blind Brook |
| R42 | 5/31/2017 | Town/Village of Harrison | Brentwood Brook |
| R43 | 9/28/2016 | Town/Village of Harrison | Tributary to Blind Brook |
| R44 | 2/24/2017 | Town/Village of Harrison | Brentwood Brook |
| R45 | 4/19/2016 | Town/Village of Harrison | Tributary to Blind Brook |
| R46 | 10/20/2017 | City of Rye | Tributary to Beaver Swamp Brook |
| R48 | 8/9/2018 | Town/Village of Harrison | Rye Lake |
| R49 | 11/19/2018 | Town/Village of Harrison | Brentwood Brook |
| R51 | 1/28/2019 | Town/Village of Harrison | Mamaroneck River |
| R52 | 8/21/2018 | Town/Village of Harrison | Blind Brook |
|  | 8/9/2018 | Town/Village of Harrison | Rye Lake |
|  | 1/28/2019 | Town/Village of Harrison | Mamaroneck River |
| R55 | 2/5/2019 | Town/Village of Harrison | Blind Brook |
| R56 | 6/1/2019 | Town/Village of Harrison | Blind Brook |
| R65 | 9/25/2018 | Village of Port Chester | Byram River |
| R66 | 12/21/2018 | Village of Port Chester | Long Island Sound |
| R67 | 7/31/2019 | Village of Port Chester | Byram River |
| R68 | 7/31/2019 | Village of Port Chester | Byram River |
| R57 | 10/16/2019 | Mamaroneck WWTP | Long Island Sound |
| R58 | 10/27/2019 | Mamaroneck WWTP | Long Island Sound |
| R59 | 10/28/2019 | Mamaroneck WWTP | Long Island Sound |

i

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix C – SSOs Reaching Waters of the United States**
**November 5, 2015 through June 30, 2020**

| SSO # | DATE | COLLECTION SYSTEM | RECEIVING WATER BODY |
|-------|------|-------------------|----------------------|
| R60 | 10/30/2019 | Mamaroneck WWTP | Long Island Sound |
| R61 | 10/31/2019 | Mamaroneck WWTP | Long Island Sound |
| R62 | 7/26/2017 | City of New Rochelle | Long Island Sound |
| R63 | 3/2/2018 | New Rochelle WWTP (ORF) | Long Island Sound |
| R64 | 10/27/2019 | Village of Port Chester | Byram River |
| R70 | 8/3/2019 | Village of Port Chester | Byram River |
| R71 | 8/7/2019 | Village of Port Chester | Byram River |
|  | 8/7/2019 | Village of Port Chester | Byram River |
| R73 | 5/16/2019 | Village of Port Chester | Byram River |
| R74 | 1/11/2018 | Village of Port Chester | Long Island Sound |
|  | 1/19/2018 | Village of Port Chester | Long Island Sound |
| R79 | 2/1/2016 | City of Rye | Beaver Brook |
|  | 3/10/2017 | City of Rye | Blind Brook |
| R81 | 8/1/2017 | City of White Plains | Mamaroneck River |
| R83 | 2/23/2018 | White Plains | Bronx River |
| R84 | 12/3/2019 | Village of Port Chester | Byram River |
| R85 | 12/5/2019 | Village of Port Chester | Byram River |
| R87 | 12/9/2019 | Mamaroneck WWTP | Long Island Sound |
| R88 | 12/11/2019 | Mamaroneck WWTP | Long Island Sound |
| R89 | 12/13/2019 | Mamaroneck WWTP | Long Island Sound |
| R90 | 12/14/2019 | New Rochelle WWTP (ORF) | Long Island Sound |
| R91 | 12/19/2019 | Mamaroneck WWTP | Long Island Sound |
| R92 | 12/20/2019 | Mamaroneck WWTP | Long Island Sound |
| R93 | 12/30/2019 | Mamaroneck WWTP | Long Island Sound |

**Save the Sound & Atlantic Clam Farms of Connecticut, Inc.**
**Appendix C – SSOs Reaching Waters of the United States**
**November 5, 2015 through June 30, 2020**

| SSO # | DATE | COLLECTION SYSTEM | RECEIVING WATER BODY |
|-------|------|-------------------|----------------------|
| R94 | 12/31/2019 | Mamaroneck WWTP | Long Island Sound |
| S47 | 11/16/2018 | Village of Larchmont | Long Island Sound |
| | 1/2/2020 | Village of Port Chester | Byram River |
| | 2/12/2020 | Village of Port Chester | Byram River |
| | 1/25/2020 | Mamaroneck WWTP | Long Island Sound |
| | 3/23/2020 | Mamaroneck WWTP | Long Island Sound |
| | 4/13/2020 | Mamaroneck WWTP | Long Island Sound |
| | 4/14/2020 | Mamaroneck WWTP | Long Island Sound |
| | 5/1/2020 | Mamaroneck WWTP | Long Island Sound |